**J.B., Plaintiff,**

**v.**

**KILLINGLY BOARD OF EDUCATION, David Cressy, Superintendent of the Killingly Board of Education, Connecticut Department of Mental Health, Dr. Albert Solnit, Commissioner of the Connecticut Department of Mental Health, Connecticut Department of Children and Families, Christine Ragaglia, Commissioner of the Connecticut Department of Children and Families, Defendants.**

**No. 3:97 CV 1900(GLG).**

United States District Court, D. Connecticut.

Dec. 19, 1997.

---

Anne Louise Blanchard, Douglas M. Crockett, Connecticut Legal Services, Inc., Willimantic, CT, for J.B.

Lawrence J. Campane, Mark J. Sommaruga, Sullivan, Schoen, Campane & Connon, LLC, Hartford, CT, for Killingly Bd. of Educ., David Cressy, Superintendent of the Killingly Bd. of Educ.

Patricia A. Gerner, Atty. General's Office, Dept. of Health & Human Services, Hartford, CT, for Connecticut Dept. of Mental Health and Addiction Services, Albert Solnit, Commissioner of the Connecticut Dept. of Mental Health.

Susan T. Pearlman, Atty. General's Office, Dept. of Children & Families, Hartford, CT, for Connecticut Dept. of Children and Families, Christine Ragaglia, Commissioner of the Connecticut Dept. of Children and Families.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

GOETTEL, District Judge.

Plaintiff, J.B., moves for a preliminary injunction to enjoin defendants, Killingly Board of Education ("Killingly"), Connecticut Department of Mental Health and Addiction Services ("DMH"), and Connecticut Department of Children and Families ("DCF"), from denying J.B. a free appropriate public education, as required by the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400–1487 (amended June 4, 1997), with accompanying regulations, 34 C.F.R. pt. 300 (1997). In his motion for a preliminary injunction, plaintiff urges this Court to order defendants to provide him with an appropriate community-based residential special education placement, other than his current institutional placement, during the pendency of this litigation.[1] Plaintiff further requests that his residential program should include treatment for his disability-related needs, including vocational training and instruction on socialization, daily living skills, community

---

1. While plaintiff is requesting a transfer to a community-based residential program, the specific placement is as yet unidentified. At a one-day evidentiary hearing held before this Court, plaintiff's counsel suggested placing J.B. in an out-of-state program, possibly a Brown and Sullivan group home, because Connecticut does not have such a program. The group home would be based in a community. As part of the placement, J.B. would potentially receive twenty-four hour line-of-sight supervision. As an initial matter, this Court notes that it would be possible to decide that J.B. requires an out-of-state residential program that is as yet unidentified. *See Abrahamson v. Hershman*, 701 F.2d 223 (1st Cir. 1983) (affirming the district court's decision to place child in a then-unidentified group home); *Gladys J. v. Pearland Indep. Sch. Dist.*, 520 F.Supp. 869, 878–79 (S.D.Tex.1981) (ordering the placement of a disabled child in an unidentified facility with a year-round program and twenty-four hour supervision).

living skills, and appropriate sexual behavior.

After considering testimony given during a one-day evidentiary hearing, the various written submissions, and the final decision of a state administrative hearing taken after several days of testimony, this Court renders the following findings of fact and conclusions of law on plaintiff's motion for a preliminary injunction.

## FACTUAL BACKGROUND

J.B. is twenty years old and has been identified as needing special education since he was eight. Within the past twelve years, J.B. has been identified as language and learning disabled. After being charged with fourth degree sexual assault of several young boys in early 1991, J.B. was identified as a sex offender due to the pedophiliac nature of the offense. A July 3, 1991 psychiatric evaluation diagnosed J.B. with "conduct, disorder, socialized, aggressive" and "mixed specific developmental disorder." In 1993, J.B. was diagnosed with attention deficit disorder and multiple personality disorder (also known as dissociative identity disorder). The multiple personality disorder diagnosis was subsequently confirmed by a psychiatrist in 1994 and a licensed clinical psychologist in 1995.

In grammar school, J.B. received special education from the Killingly Board of Education in a local public school by taking his academic subjects in self-contained classrooms and some "special" subjects in regular education classes. By seventh grade in about 1990, J.B.'s Planning and Placement Team ("PPT") recommended that he take some classes in a special education resource room and others in integrated classes.

In April 1991, following the sexual assault charges, DCF placed J .B. at Harmony Hill, a residential treatment facility in Chepachet, Rhode Island. All parties agree that his placement at Harmony Hill was for non-educational reasons. At a PPT meeting on May 15, 1991, Killingly agreed to pay for J.B.'s special education, except for summer school tuition, during his placement at Harmony Hill. DCF accepted financial responsibility for the room and board expenses. On July 3, 1991, a psychiatric evaluation recommended providing. J.B. with individual counseling, a psychiatric residential placement, and a special education program.

By August 1991, J.B. was receiving individual psychotherapy and was participating in family therapy sessions. Within J.B.'s first year at Harmony Hill, however, J.B. was involved in at least two incidents of sexual misconduct. Due to his risk of re-offending, J.B.'s home visits were temporarily discontinued.

As of September 1991, J.B.'s reading and math skills were at the fourth grade level, and his writing skills and general knowledge were at the third grade level. By October 1992, J.B. had advanced one grade level and was performing at the fifth grade level.

At a PPT meeting on June 7, 1993, J.B. was found to require a "residential setting to profit from his special class program." J.B. remained at Harmony Hill, however, for non-educational reasons due to the extension of his delinquency petition. For the 1993–94 school year, J.B.'s special education program consisted of 27.5 hours per week of special education classes, two hours per week of counseling, and 1.5 hours per week of speech and language services. His program for the 1994–95 school year called for 5.5 hours per week of secondary special education classes and forty-five minutes per week of individual therapy.

Throughout his residence at Harmony Hill, J.B. continued to receive individual and family therapy. Despite making some progress towards managing his emotional problems, J.B. was still considered at risk for re-offending. After J.B. was observed inappropriately touching other students, J.B.'s home visits were again discontinued in February 1994.

In a July 30, 1994 report, one psychiatrist supported J.B.'s move to a more restrictive residential setting based on information from a Harmony Hill treatment team that J.B.'s therapy was stagnating. Later in 1994, J.B.'s treatment team recommended moving J.B. to a more restrictive hospital setting to address J.B.'s multiple personality disorder diagnosis. His treatment team also believed that J.B. was targeting other students for

future sexual activity. They also stated that J.B. potentially would progress more in therapy if he were placed in a program with other young adults.

On May 31, 1995, J.B. was transferred to High meadows, which is a residential treatment program operated by DCF in Hamden, Connecticut. With J.B.'s parents' consent, DCF agreed to care for J.B. through an "Uncared for with Specialized Needs" commitment. *See* Conn.Gen.Stat. § 17a–11(d) (1992 & Supp.1997) (permitting DCF Commissioner to continue to care for children, already under DCF supervision, until age twenty-one). During the one-day evidentiary hearing before this Court, the parties indicated that J.B.'s parents would no longer support J.B. Thus, J.B. does not have the option of returning to his parents once he turns twenty-one on May 21, 1998.

After a PPT determined that J.B. had accumulated sufficient credits to graduate (although it is clear that J.B. had not achieved a high school level of competency in any subject area), the PPT issued J.B. a high school diploma dated June 1995. The PPT also determined that J.B. was no longer qualified to receive special education services, but gave him the option of continuing to attend the High Meadows school, which he elected to do.

On November 1, 1995, Diane Cox–Lindenbaum, an expert on sexual offenders, performed a social-sexual evaluation of J.B. She found that J.B.'s "sexual offenses are not due to [his] language disorder or low average intelligence." She also found that J.B. was at risk for re-offending. To protect J.B. and the community, she proposed a community-based residential treatment program which would include various therapies to address J.B.'s pedophilia and multiple personality disorder. She concluded that J.B. "will always require life-long supervision of some sort to ensure that he and his community remain safe. [He] could, however, attend a community educational setting if he has one-to-one

constant supervision and the support of the school's administration."

In a March 13, 1996 meeting, a PPT determined that J.B. did not require a twenty-four hour residential setting for educational reasons. It also discontinued J.B.'s identification as learning disabled because J.B.'s "classroom functioning appeared to be commensurate with his intellectual ability." The individualized education program ("IEP")[2] provided that J.B.'s program should include seventeen hours per week of instruction in regular classes, thirty minutes per week of counseling, and forty-five minutes per week of direct speech and language services. At this time, J.B. was performing academically at a fifth to sixth grade level. By April 1997, J.B.'s reading skills were at a 6.4 grade level and his spelling skills were at a fifth grade level. His math skills were at a 4.6 grade level, but his skills improved with the use of a calculator.

While J.B. has been at High Meadows, he has not demonstrated any sexually offensive behavior.

## FINDINGS OF THE HEARING OFFICER FROM THE ADMINISTRATIVE IMPARTIAL DUE PROCESS HEARING

On March 15, 1996, J.B., through counsel, requested an impartial due process hearing pursuant to 20 U.S.C. § 1415(b)(2) (1990) and Conn.Gen.Stat. § 10–76h(a)(1) (1996) to review his special education program and his current educational placement. The Connecticut State Board of Education appointed an independent hearing officer (the "Hearing Officer") who heard testimony over six days in 1996 and one day in 1997.[3] Before her final decision, the Hearing Officer had issued two interim orders in June and September 1996, respectively. The first order held that Killingly had erroneously issued J.B. a high school diploma because a PPT had never been convened to establish appropriate graduation requirements. The second order in-

---

2. *See infra* at 66–67 (discussing the definition of an IEP and its requirements).

3. In compliance with section 1415(b)(2), the Hearing Officer had not participated in any previous identification, evaluation, or educational

placement of J.B., and she was not a member of the Killingly Board of Education, which was the school district under review. 20 U.S.C. § 1415(b)(2) (1990); Conn.Gen.Stat. § 10–76h(c)(1) (1996 & Supp.1997).

corporated an agreement pursuant to which Killingly, in coordination with DMH which had agreed to provide treatment services, agreed to provide J.B. with educational services through the school year in which J.B. turned twenty-one years old. For financial reasons, however, DMH stated that it would not be able to provide J.B. with a community-based residential program. With respect to this decision, the Hearing Officer stated that "[W]ithout entering into a cost-benefit analysis with regard to the proposed program, it is at least regrettable and possibly reprehensible that DMH has reneged on its voluntary agreement to provide [J.B.] with a community-based program."

In her final decision dated July 24, 1997, the Hearing Officer concluded that J.B. does not require a residential placement to benefit from special education. Her reasoning was partially based on a PPT's determination of March 13, 1996 that J.B. did not require a twenty-four hour residential placement for educational reasons. The Hearing Officer also cited Conn.Gen.Stat. § 10–76d(e)(1) (1996 & Supp.1997) as providing that a local board of education is responsible for funding only the reasonable costs of special education, and not the full cost of a residential placement, if the child's residential placement was for non-educational reasons. The Hearing Officer further concluded that the scope of special education and related services does not include the acquisition of socialization or community living skills in a residential treatment program because no evidence indicated that J.B.'s emotional and educational problems were intertwined.

On the issue of which state agency bears responsibility for funding services provided to J.B., the Hearing Officer found that the State Department of Education serves as the central point of responsibility for educating disabled children. She stated that she lacked jurisdiction to order DCF to provide J.B. with treatment for his emotional disabilities because she found this outside the scope of her authority pursuant to Conn.Gen.Stat. § 10–76h(d)(1) (1996). She also stated that because these services were intended to treat J.B.'s pedophilia, they were not related services under the IDEA. She noted that if J.B. disagreed with a plan of services offered by DCF, his recourse would be to a DCF hearing officer pursuant to 42 U.S.C. § 671(a)(12) (1991 & Supp.1997). Finally, she suggested that DCF should coordinate with DMH to transition J.B. to an appropriate program, but she also stated that she lacked the jurisdiction to order this type of transition.

The Hearing Officer recognized that DMH had not yet deemed J.B. eligible to receive its services because he has not been voluntarily or involuntarily civilly committed to a DMH facility. The Hearing Officer then dismissed DMH from the hearing because she reasoned that "a Connecticut due process hearing officer can not order the commitment of an individual to the care of DMH nor can they order DMH to provide services where DMH has not determined an individual's eligibility for DMH services." According to DMH representatives, even though DMH has no current proposed program for J.B., DMH would treat him in a state mental hospital, if he is evaluated as a dangerous person with a mental illness, or on an outpatient basis, if he is found to be mentally ill and not dangerous.

The Hearing officer noted that federal law requires the state educational agency to implement interagency agreements which delineate the various agencies' responsibilities for providing services to disabled children. 20 U.S.C. § 1413(a)(13) (1990 & Supp.1997), *amended by* 20 U.S.C. § 1412(a)(12)(A) (amended June 4, 1997). She also stated that the agencies in this case have interagency agreements that have been approved by the state board of education and the federal department of education. She found, however, that these interagency agreements did not operate as they were intended to operate. She criticized the state department of education, DMH, and DCF for not having workable interagency agreements which would ensure that children with complex needs, like J.B., do not "fall between the cracks." While the Hearing Officer found that she did not have jurisdiction to enforce these interagency agreements, she urged the state department of education, DMH, and DCF to redesign their agreements to meet the requirements of federal law.

Finally, the Hearing Officer found that J.B. is entitled to up to two years compensatory education from Killingly due, to the inadequate transition services provided to him. She found that the transition services did not meet the requirements of 34 C.F.R. § 300.18(b)(2)(i)–(iii) (1997) and that there was "no coordinated set of outcome-oriented activities that could promote movement towards independent living." She therefore ordered Killingly to convene a PPT meeting to "plan and implement a transition program that includes the determination of graduation goals and objectives, the establishment of linkages with public agencies, and such activities as mentioned in Conclusions of Law number 11 (describing the requirements of 34 C.F.R. § 300.18 (1997)])." After the Hearing officer's final decision, J.B. appealed to this Court for a review of his special education program and his entitlement to a community-based residential placement.

## DISCUSSION

### 1. Statutory Framework of the IDEA

Congress enacted the IDEA,[4] formerly known as the Education of the Handicapped Act, to ensure access for all disabled children to a free appropriate public education that "emphasizes special education and related services designed to meet their unique needs and prepare them for employment and independent living." 20 U.S.C. § 1400(d)(1)(A) (amended June 4, 1997) (amending 20 U.S.C. § 1400(c) (1990 & Supp.1997)). In order for a state to receive federal funds under the IDEA, it must comply with the IDEA's substantive educational goals and procedural protections. *Honig v. Doe*, 484 U.S. 305, 310, 108 S.Ct. 592, 597, 98 L.Ed.2d 686 (1988). At a minimum, states must adopt a policy to provide a free appropriate public education to children with disabilities. 20 U.S.C. § 1412(1) (1990 & Supp.1997), *amended by* 20 U.S.C. § 1412(a)(1) (amended June 4, 1997). According to the Supreme Court, the term "free appropriate public education" means "educational instruction specially designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child 'to benefit' from the instruction." *Board of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 188–89, 102 S.Ct. 3034, 3041–42, 73 L.Ed.2d 690 (1982). A state is not required, however, to maximize the potential of each disabled child equal to the opportunity provided to other children. *Id.* at 189–90, 102 S.Ct. at 3042. Instead, a state must ensure that each disabled child has meaningful access to special education and related services. *Id.* at 192, 102 S.Ct. at 3043–44. Due to its participation in the IDEA program, Connecticut has enacted legislation to meet its federal requirements. *See* Conn. Gen.Stat. §§ 10–76a through 10–76ee (1996 & Supp.1997).

The federal regulations implementing the IDEA provide that each responsible public agency "shall ensure that a continuum of

---

4. On June 4, 1997, Congress amended and revised the IDEA. Individuals with Disabilities Education Act Amendments of 1997, § 1, Pub.L. No. 105–17, 111 Stat. 37 (1997) ("1997 Amendments"). With some exceptions, the 1997 Amendments provide for an effective date concurrent with the amendments' enactment on June 4, 1997. 1997 Amendments, tit. II, § 201(a)(1). Courts interpreting the 1997 Amendments have held them to apply only prospectively because the 1997 Amendments do not specify that they would apply retroactively. *Fowler v. Unified Sch. Dist. No. 259*, 128 F.3d 1431, 1434–36 (10th Cir.1997); *see Heather S. by Kathy S. v. Wisconsin*, 125 F.3d 1045, 1047 n. 1 (7th Cir.1997) (considering only the unamended version of the IDEA because all events relating to plaintiff's cause of action arose before the amendments' enactment); *Cypress–Fairbanks Indep. Sch. Dist. v. Michael F.*, 118 F.3d 245, 247 n. 1 (5th Cir.1997) (same). In this case, the 1997 Amendments apply to any prospective relief granted by the Hearing Officer, including the two-year compensatory education award, the finding that J.B. does not require a residential placement in order to receive educational benefits, and the decision on each defendant's financial responsibility, because the Hearing Officer's decision of July 24, 1997 came after the 1997 Amendments' enactment. Any events occurring before the June 4, 1997 enactment date shall be governed by. the unamended statute, including the issues of whether the state complied with the IDEA's procedural requirements and whether J.B.'s IEP was reasonably calculated to enable him to receive educational benefits. *See Board of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 206–07, 102 S.Ct. 3034, 3050–51, 73 L.Ed.2d 690 (1982) (setting forth the standard by which courts should review a hearing officer's decision).

alternative placements is available to meet the needs of children with disabilities for special education and related services." 34 C .F.R. § 300.551(a) (1997). This continuum includes instruction in special schools, hospitals, and , institutions. 34 C.F.R. § 300.551(b)(1) (1997); *see* 34 C.F.R. § 300.17(a)(1)(i) (1997) (defining special education). Additionally, the state educational agency must strive to provide special education and related services in the least restrictive environment by educating disabled children with non-disabled children. 20 U.S.C. § 1412(5)(B) (1990 & Supp.1997), *amended by* 20 U.S.C. § 1412(a)(5)(A) (amended June 4, 1997). If, however, disabled children require separate educational instruction in private facilities, the state will pay for these placements at no cost to their parents or guardian. 20 U.S .C. § 1413(a)(4)(B)(i) (1990 & Supp.1997), *amended by* 20 U.S.C. § 1412(a)(10)(B)(i) (amended June 4, 1997). The regulations further specify that a disabled child, where appropriate, may be . placed in a public or private residential treatment program in order to receive special education and related services. 34 C.F.R. § 300.302 (1997). In Connecticut, before a disabled child may be placed in a private residential program at no cost to the parents or guardian, the commissioner or the local or regional board of education must agree that such a placement is "necessary and proper and no state institution is available to meet such child's needs." Conn.Gen.Stat. § 10–76d(d) (amended . as effective on July 1, 1997); *see* 20 U.S.C. §· 1413(a)(4)(B)(ii) (1990) (requiring state educational agencies to determine whether the private facilities meet the standards applicable to state and local educational agencies), *amended by* 20 U.S.C. § 1412(a)(10)(B)(ii) (amended June 4, 1997).

One of the procedural safeguards that protects a disabled child's right to education is an IEP, which is a written statement tailored to each disabled child's unique educational needs. 20 U.S.C. § 1401(a)(20) (1990 & Supp.1997), *amended by* 20 U.S.C. §§ 1401(11) & 1414(d) (amended June 4, 1997); *see Connecticut–Unified Sch. Dist. No. 1 v. State Dep't of Educ.*, 45 Conn.Supp. 57, 67, 699 A.2d 1077, 1084 (1997) (stating

that the IEP is the "absolutely critical ingredient in the special education program for a child in need"). Under Connecticut law, a disabled child's IEP is developed during a PPT meeting after a child is initially identified as learning disabled. Conn. Agencies Regs. § 10–76d–11(a) (1997); *see* Conn. Agencies Regs. § 16–76d–10 (1997) (providing that PPTs must ensure that all disabled children receive special education and related services). The IEP must include statements of a disabled child's present level of education, instructional objectives and criteria for determining if the child is meeting these goals, specific educational services to be provided to each disabled child, and any necessary transition services, along with a statement of interagency responsibilities, for each child beginning no later than age sixteen. 20 U.S.C. § 1401(a)(20) (1990 & Supp.1997), *amended by* 20 U.S.C. § 1414(d) (amended June 4, 1997). The local educational agency must review and, if appropriate, revise a disabled child's IEP at least annually. 20 U.S.C. § 1414(a)(5) (1990 & Supp.1997), *amended by* 20 U.S.C. § 1414(d)(4) (amended June 4, 1997); Conn. Agencies Regs. § 10–76d–11(b) (1997). The definition of an IEP also provides that if a "participating agency, other than the educational agency fails to provide agreed upon services, the educational agency shall reconvene the IEP team to identify alternative strategies to meet the transition objectives." 20 U.S.C. § 1401(a)(20) (1990 & Supp.1997), *amended by* 20 U.S.C. § 1414(d)(5) (amended June 4, 1997).

Another procedural safeguard that protects a disabled child's right to a free appropriate public education is the process for reviewing the child's special education program. A disabled child's parents or guardian, or the child if he or she is ˙over age eighteen, may request an impartial due process hearing, inter alia, to review the child's special education program and educational placement. Conn.Gen.Stat. § 10–76h(a)(1) (1996); *see* 20 U.S.C. § 1415(b)(2) (1990) (setting forth the procedures for an impartial due process hearing), *amended by* 20 U.S.C. § 1415(f) (amended June 4, 1997). The purpose of an impartial due process hearing is to

"review the special education needs of a particular child and how those needs should be met by the local board or unified school district responsible for providing educational services to the child." *Connecticut–Unified Sch. Dist. No. 1*, 45 Conn.Supp. at 65, 699 A.2d at 1082.

Any party aggrieved by the outcome of a state administrative hearing may bring a civil action in state or federal court. 20 U.S.C. § 1415(e)(2) (1990), *amended by* 20 U.S.C. § 1415(i)(2)(A) (amended June 4, 1997); Conn.Gen.Stat. § 10–76h(d)(3) (1996) (setting forth the process for appealing a hearing officer's decision). If the appeal is filed in federal court, district courts will have jurisdiction without regard to the amount in controversy. 20 U.S.C. § 1415(e)(4)(A) (1990 & Supp.1997), *amended by* 20 U.S.C. § 1415(i)(2)(A) (amended June 4, 1997).

When a federal court reviews a hearing officer's findings and conclusions, it must base its decision on a preponderance of the evidence after reviewing the administrative record and, at a party's request, after hearing additional evidence. 20 U.S.C. 1415(e)(2) (1990), *amended by* 20 U.S.C. § 1415(i)(2)(B) (amended June 4, 1997); *see Garro v. Connecticut*, 23 F.3d 734, 736 (2d Cir.1994) (stating that a court's "authority to review state administrative determinations on matters of special education is limited"). In *Rowley*, the Supreme Court further explained that the standard of review set forth in section 1415(e)(2), as amended by section 1415(i)(2)(B), implicitly requires reviewing courts to give "due weight" to state administrative proceedings. 458 U.S. at 206, 102 S.Ct. at 3050–51. In a recent IDEA case, the Second Circuit stated that reviewing courts need not give due weight to conclusions of law involving the "proper interpretation of the federal statute and its requirements." *Mrs. B.*, 103 F.3d at 1121; *see P.J. by and Through Mr. and Mrs. W.J. v. Connecticut Bd. of Educ.*, 788 F.Supp. 673, 679 (D.Conn.1992) (noting that a hearing officer's decision merits deference only when it is supported by the facts in the record and is correct as a matter of law). Additionally, reviewing courts must avoid substituting their views of educational policy and methods for those of state educational agencies. *Rowley*, 458 U.S. at 207, 102 S.Ct. at 3051; *see Briggs v. Board of Educ. of Conn.*, 882 F.2d 688, 693 (2d Cir.1989) (giving deference to state and local agencies' expertise on matters of special educational programs); *see Garro*, 23 F.3d at 736 (upholding a hearing officer's finding that a child was not learning disabled because plaintiff did not specify any legal or factual errors that would outweigh the deference given to state officials); *Mr. X v. New York State Educ. Dep't*, 975 F.Supp. 546, 558–61 (S.D.N.Y.1997) (applying New York law and overturning the conclusions of the state hearing and review officers because neither the record nor the law supported their decisions that the child was provided with a free appropriate public education).

### 2. Jurisdiction over DMH and DCF

Giving due weight to the Hearing Officer's findings of fact, and with the benefit of the additional evidence presented to this Court, we address plaintiff's challenges to his special education program and his entitlement to a community-based residential placement. At the outset, however, we address DMH's arguments that it is not a proper party defendant to this suit and, alternatively, that the stay put provision of the IDEA controls and obviates the need for consideration of plaintiff's request for a preliminary injunction. We also consider whether a hearing officer has the authority to order non-educational agencies to provide special education and related services to disabled children.

#### a. Jurisdiction Over DMH

■ According to the Hearing Officer, defendant DMH was made a party to this matter over its strenuous objections. DMH argues that this Court lacks jurisdiction over it because J.B. was never under DMH care and DMH has not yet deemed J.B. eligible to receive DMH services. Plaintiff, however, contends that DMH bears partial responsibility for providing him with special education and related services pursuant to an interagency agreement between DCF and DMH. Plaintiff further argues that the DCF–DMH interagency agreement violates the IDEA because it fails to comply with the statutory

requirements. Finally, plaintiff has asserted a state-law promissory estoppel claim against DMH.

■ Based on plaintiff's claims against DMH pursuant to the interagency agreement and his independent promissory estoppel claim, we find that DMH is a proper party to this action. The question of whether DMH bears partial financial responsibility for J.B.'s special education and related services, however, does not need to be resolved in this motion for a preliminary injunction. To prevail on this motion, plaintiff must satisfy only the preliminary injunction standard of irreparable harm and a substantial likelihood of success on the merits, and does not need to prove his entire case by a preponderance of the evidence at this time. Thus, this Court reserves decision on the issue of DMH's liability under its interagency agreement with DCF until the issue is properly before this Court for final adjudication.

■ Additionally, pursuant to 28 U.S.C. § 1367(a) (1993), this Court has supplemental jurisdiction over J.B.'s state law claim because the promissory estoppel cause of action and the federal claim that DMH violated the IDEA derive from a common nucleus of operative facts. See United Mine Workers v. Gibbs, 383 U.S. 715, 725–26, 86 S.Ct. 1130, 1138–39, 16 L.Ed.2d 218 (1966) (finding that the exercise of pendent jurisdiction is appropriate when federal and state claims have a common nucleus of operative fact); King v. Crossland Sav. Bank, 111 F.3d 251, 256 (2d Cir.1997) (upholding the district court's exercise of supplemental jurisdiction over plaintiffs' state-law claims because the court properly had original jurisdiction over plaintiffs' federal causes of action). Moreover, this is not a case in which plaintiff's state-law claims predominate to such a degree that this Court could exercise its discretion to decline jurisdiction over these claims. 28 U.S.C. § 1367(c)(2) (1993). Based on the discussion of plaintiff's promissory estoppel claim, infra at section 6, we will defer ruling on this claim until after a full hearing on the merits.

#### b. The Stay Put Provision

■ Defendant DMH argues that the "stay put" provision of the IDEA applies, thereby requiring J.B. to remain at High Meadows during the pendency of these proceedings. When disputes arise between a child's parents or guardian and the responsible public agency about the child's placement, section 1415(j) of the IDEA provides that "the child shall remain in the then-current educational placement" unless the state or local educational agency and the parents otherwise agree. 20 U.S.C. § 1415(j) (amended June 4, 1997) (amending 20 U.S.C. § 1415(e)(3)(A) (1990 & Supp. 1997)). This "status quo" provision acts as an automatic preliminary injunction. Zvi D. v. Ambach, 694 F.2d 904, 906 (2d Cir.1982); see Honig v. Doe, 484 U.S. 305, 323, 108 S.Ct. 592, 604, 98 L.Ed.2d 686 (1988) (stating that the stay put provision is a "clear directive" to keep a disabled child in his or her then-current placement during the pendency of proceedings under the IDEA).

We find that defendant DMH is not entitled to invoke the stay put provision because it is not the party that the statute was intended to protect. See Susquenita Sch., Dist. v. Raelee S., 96 F.3d 78, 84 (3d Cir. 1996) (stating that the stay put provision was "drafted to guard the interests of parents and their children"). Generally, a child's parents or guardian invoke the stay put provision to maintain the child's then-current educational placement when they disagree with a school board's proposed change of the child's placement. See School Comm. of Burlington v. Department of Educ. of Mass., 471 U.S. 359, 373, 105 S.Ct. 1996, 2004, 85 L.Ed.2d 385 (1985) (stating that one purpose of the stay put provision is to "prevent school officials from removing a child from the regular public school classroom over the parents' objection pending completion of the review proceedings"). Moreover, the purpose of the IDEA's procedural safeguards, including the stay put provision, is to protect a disabled child's right to a free appropriate public education. Thus, this Court rejects DMH's argument that the stay put provision requires this Court to order J.B. to remain at High Meadows during the pendency of these proceedings.

Instead of applying the stay put provision of section 1415(j) (amending section

1415(e)(3)(A)), this Court will grant relief, if appropriate, according to section 1415(i)(2)(B)(iii) (amending section 1415(e)(2)). The stay put provision of section 1415(j) (amending section 1415(e)(3)(A)) has been interpreted as operating in conjunction with section 1415(i)(2)(B)(iii) (amending section 1415(e)(2)), which allows courts to grant all appropriate equitable relief. *See K.P. v. Juzwic,* 891 F.Supp. 703, 712 (D.Conn.1995) (analyzing the stay put provision together with the predecessor to section 1415(i)(2)(B)(iii)). According to the Supreme Court in *Honig,* the "stay-put provision in no way purports to limit or pre-empt the authority conferred on courts by [the predecessor to section 1415(i)(2)(B)(iii)]; indeed, it says nothing whatever about judicial power." *Honig,* 484 U.S. at 327, 108 S.Ct. at 606 (internal citation omitted). Accordingly, a court may choose between granting injunctive relief favoring the status quo under section 1415(j) (amending section 1415(e)(3)(A)) or changing a child's placement and the financial responsibility for such a placement under section 1415(i)(2)(B)(iii) (amending section 1415(e)(2)). *See Stacey G. v. Pasadena Indep. Sch. Dist.,* 695 F.2d 949, 955 n. 5 (5th Cir.1983) (stating that the stay put provision "does not place a statutory bar to the district court's grant of equitable relief that may result in a change of funding of the child's placement, or a modification of the placement"); *Doe v. Brookline Sch. Comm.,* 722 F.2d 910, 918 (1st Cir.1983) (holding that the stay put provision "establishes a strong preference, but not a statutory duty, for maintenance of the status quo").

## C. Hearing Officer's Authority

In this case, the Hearing officer concluded that she lacked jurisdiction to order DCF or DMH to provide services to J.B., and vaguely alluded to other forums in which J.B. could contest an agency's refusal of services. A hearing officer has "the authority to confirm, modify, or reject the identification, evaluation or educational placement of or the provision of a free appropriate public education to the child ... or to prescribe alternate special educational programs for the child or pupil." Conn.Gen.Stat. § 10–76h(d)(1) (1996). Thus, Connecticut law expressly permits a hearing

officer to issue orders relating to a child's special education needs. *Connecticut–Unified Sch. Dist. No. 1,* 45 Conn.Supp. at 65, 699 A.2d at 1083; *see Mrs. B. v. Milford Bd. of Educ.,* 103 F.3d 1114, 1119 (2d Cir.1997) (noting that the hearing officer had ordered the board of education to refrain from transitioning the child back into the public school system for another year). *Papacoda v. Connecticut,* 528 F.Supp. 68, 71 (D.Conn.1981) (noting that the hearing officer had ordered defendants to pay for the costs of the child's special education services).

With respect to non-educational agencies, this Court has jurisdiction to order DCF and DMH to provide J.B. with services even though the Hearing officer may not have had this authority. A district court's power extends to ordering non-educational public agencies to provide a disabled child with special education and related services, if such agencies are obligated to provide these services under state or federal law, or pursuant to an interagency agreement. *See Mrs. C. v. Wheaton,* 916 F.2d 69, 75–76 (2d Cir.1990) (ordering the district court to compel defendants, the Connecticut Department of Children and Youth Services, Unified School District II, and the State Board of Education, to provide a disabled child with compensatory education); *Barbara Z. v. Obradovich,* 937 F.Supp. 710, 719 (N.D.Ill. 1996) (ordering the Illinois Department of Mental Health to pay a portion of attorney's fees owed to a disabled child's parent partially because the lack of an interagency agreement violated the IDEA); *McClain v. Smith,* 17 Educ. Handicapped L.Rep. 581, 582 (E.D.Tenn.1991) (finding an interagency agreement between the Department of Education and the Department of Mental Health inadequate and ordering the state agencies to establish appropriate interagency agreements). This conforms with congressional intent to ensure that all disabled children receive a free appropriate public education regardless of interagency disputes. 34 C.F.R. pt. 300 app. C (1997). Moreover, Congress recognized that some non-educational agencies would provide disabled children with special education and related services. 20 U.S.C. § 1412(b) (1990 &

Supp.1997)(providing that a state educational agency's duty to comply with the IDEA's requirements does not "limit the responsibility of agencies other than educational agencies in a State from providing or paying for some or all of the costs of a free appropriate public education"), *amended by* 20 U.S.C. § 1412(a)(11)(B) (amended June 4, 1997). In the 1997 Amendments, Congress stated that:

> [a] provision is added to the Act to strengthen the obligation to ensure that all services necessary to ensure a free appropriate public education are provided through the coordination of public educational and non-educational programs. This subsection is meant to reinforce two important principles: (1) that the State agency or [local educational agency] responsible for developing a child's IEP can look to noneducational agencies, such as Medicaid, to pay for or provide those services they (the noneducational agencies) are otherwise responsible for. . . .

S.Rep. No. 105–17, at 11–12 (1997). This Court agrees with the Hearing Officer that neither a hearing officer nor a court can order DMH to find a person eligible for its services because this is a discretionary decision left to the superintendent. Conn.Gen. Stat. § 17a–506(b) (1992 & Supp.1997). If, however, an otherwise responsible educational or non-educational agency fails to provide disabled children with a free appropriate public education, a district court may issue orders relating to an individual child's entitlement to special education or related services.

*3. Preliminary Injunction Standard*

Having decided that all defendants are proper parties to this suit and that this Court has jurisdiction, we will consider whether plaintiff has established that he is entitled to a preliminary injunction, which is one type of equitable relief that may be granted under section 1415(i)(2)(B)(iii) (amending section 1415(e)(2)). We now address the substance of plaintiff's motion. To merit the award of injunctive relief, the party seeking injunctive relief must show: "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make

them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2d Cir.1979); *see Securities and Exch. Comm'n v. Unifund SAL,* 910 F.2d 1028, 1039 (2d Cir.1990) (placing burden of proof on plaintiffs seeking mandatory injunctive relief). When the nature of the relief sought would disturb the status quo by ordering affirmative action, the standard for a preliminary injunction is higher. *Abdul Wali v. Coughlin,* 754 F.2d 1015, 1025 (2d Cir.1985); *see Malkentzos v. DeBuono,* 102 F.3d 50, 54 (2d Cir.1996) (applying a higher standard for the issuance of a mandatory injunction in a case brought under the IDEA where plaintiff sought to alter the status quo by commanding a positive act). This type of an injunction, known as a mandatory injunction, requires the moving party to show a substantial likelihood of success on the merits. *Johnson v. Kay,* 860 F.2d 529, 540 (2d Cir.1988). Thus, in the present case, plaintiff must establish the more stringent standard of irreparable harm and a substantial likelihood of success on the merits because plaintiff seeks to compel defendants to change his placement from High Meadows, thereby altering the status quo, to a community-based residential program.

*a. A Substantial Likelihood of Success on the Merits*

Plaintiff claims that he is being denied a free appropriate public education because his current placement at High Meadows is unable to meet his unique disability-related needs for special education and related services. He initially sought a due process hearing to review his special education program and his residential placement. During the pendency of these proceedings, plaintiff requests this Court to order defendants to provide him with a community-based residential program because it will provide him with the services he requires to transition from an institutional setting to the community.

For suits brought under section 1415(e)(2), *amended by* section 1415(i)(2), the Supreme Court in *Rowley* established a two-part inquiry for courts reviewing the findings and con-

clusions of a state administrative hearing. The reviewing court must first determine whether the state has complied with the IDEA's procedural requirements, and second whether the child's IEP is reasonably calculated to enable the child to receive educational benefits. *Rowley*, 458 U.S. at 206–07, 102 S.Ct. at 3050–51. As part of the test for determining whether a responsible public agency has met the IDEA's procedural requirements, the Supreme Court explained that this "inquiry will require a court not only to satisfy itself that the State has adopted the state plan, policies, and assurances required by the Act, but also to determine that the State has created an IEP for the child in question which conforms with the requirements of [section 1401(a)(20) (1990 & Supp.1997), *amended by* 20 U.S.C. § 1414(d) (amended June 4, 1997)]." *Rowley*, 458 U.S. at 206–07 n. 27, 102 S.Ct. at 3051 n. 27. If the state fails to meet either of these requirements, the court may grant any appropriate relief. *See Karl v. Board of Educ. of Geneseo Cent. Sch. Dist.*, 736 F.2d 873, 876 (2d Cir.1984) (requiring a reviewing court to determine if the IDEA's procedural requirements were met before proceeding to *Rowley's* second prong); *Connecticut–Unified Sch. Dist. No. 1*, 45 Conn.Supp. at 68, 699 A.2d at 1084 (stating that the "failure of a school board to satisfy either of [the *Rowley* ] criteria provides a basis for administrative or judicial relief").

■ One of the IDEA's procedural requirements is that as part of a child's IEP, a child no later than age sixteen must receive a statement of needed transition services. 20 U.S.C. § 1401(a)(20)(D) (1990 & Supp.1997), *amended by* 20 U.S.C. § 1414(d)(vii) (amended June 4, 1997). The term transition services means:

a coordinated set of activities for a student, designed within an outcome-oriented process, which promotes movement from school to post-school activities, including post-secondary education, vocational training, integrated employment (including supported employment), continuing and adult education, adult services, independent living, or community participation. The coordinated set of activities shall be based upon the individual student's needs, taking into account the student's preferences and interests, and shall include instruction, community experiences, the development of employment and other post-school adult living objectives, and, when appropriate, acquisition of daily living skills and functional vocational evaluation.

20 U.S.C. § 1401(a)(19) (1990 & Supp.1997), *amended by* 20 U.S.C. § 1401(30) (amended June 4, 1997). The implementing regulations provide that this list is not exhaustive. 34 C.F.R. § 300.18 note (1997). The Supreme Court, however, found that the IDEA does not substantively require states to ensure that all disabled children become self-sufficient. *Rowley*, 458 U.S. at 201–02 n. 23, 102 S.Ct. at 3048 n. 23.

The Hearing Officer found that Killingly did not provide J.B. with adequate transition services because the written plans did not provide for a coordinated set of activities that included instruction, community experiences, and the development of employment and other post-school adult living objectives. *See* 34 C.F.R. § 300.18 (1997) (setting forth the required components of a student's coordinated set of activities). The Hearing Officer further found that J.B. did not receive a coordinated set of activities designed to promote movement from school to independent living. 34 C.F.R. § 300.18(a) (1997). As of October 12, 1994, when J .B. was seventeen, J.B.'s IEP included a page for transition services but it did not address specific education, employment, or community participation needs. Additionally, the Hearing Officer described J.B .'s work experiences at High Meadows and Harmony Hill as "make-work." The Hearing Officer concluded that "[w]hile there is no dispute with regard to (J.B.'s) need for close supervision, this need in and of itself should not have prevented adequate transition services."

■ This Court defers to the Hearing Officer's factual findings on the type of transition services, or lack thereof, provided to J.B. once he turned sixteen. This Court further finds that the Hearing Officer correctly interpreted the statutory requirements for transition services, except that, if appropriate, J.B.'s coordinated set of activities

should have included the acquisition of daily living skills and functional vocational evaluation. 34 C.F.R. § 300.18(b)(2)(iv) (1997). Due to the state's failure to comply with the IDEA's procedural requirements by not adequately providing transition services, this Court finds that the state did not meet the first prong of the *Rowley* inquiry. Accordingly, this Court finds that J.B. has established the substantial-likelihood-of-success-on-the-merits prong of the preliminary injunction standard because he can prove that his IEP violated the IDEA's procedural requirements.

### b. Irreparable Harm

To prove the second prong of the preliminary injunction standard, plaintiff argues that he will suffer irreparable harm by remaining at High Meadows if the preliminary injunction is not granted to compel defendants to place J.B. in a community-based residential treatment program. J.B. asserts that continued placement in an institutional residential setting will exacerbate his disability because High Meadows does not have the facilities to treat his emotional needs and to prepare him for community living. Conversely, defendants argue that J.B. will not suffer irreparable harm by remaining at High Meadows because the Hearing officer found that J.B. was entitled to two years' compensatory education, thereby requiring Killingly to provide him with educational programming and services. DCF contends that J.B. will be receiving treatment for his pedophilia in the near future and that while J.B. is at High Meadows he is receiving special education and shelter in a safe environment.

In the Second Circuit, the standard for injunctive relief requires a finding that the plaintiff would suffer irreparable harm if the injunction is not granted. *Resolution Trust Corp. v. Elman,* 949 F.2d 624, 626 (2d Cir. 1991). In *Papacoda v. Connecticut,* 528 F.Supp. 68 (D.Conn.1981), the court found that an emotionally disturbed child would suffer irreparable harm if she were removed from her current out-of-state residential treatment program "because she [would] be denied her statutory right to education." 528 F.Supp. at 72.

In this case, the Hearing Officer awarded two-years' compensatory education to J.B. In order to provide this to J.B., Killingly must convene a PPT that will prepare a revised IEP which meets the requirements of section 1414(d) (amended June 4, 1997). The record does not indicate that this PPT meeting has occurred yet. Thus, J.B. continues to be denied his right to a free appropriate public education and until he receives that to which he is entitled under the IDEA, he is suffering irreparable harm. By showing irreparable harm, J.B. has established the second part of the preliminary injunction standard. Accordingly, this Court next considers the relief available to J.B. under the IDEA.

### 4. Relief Available Under Section 1415(i)(2)(B)(iii)

J.B. argues that he requires a community-based residential treatment program in order to benefit from special education. He therefore requests this Court to order defendants to provide such a program to him at no cost, pursuant to section 1415(i)(2)(B)(iii) (amended June 4, 1997) (amending 20 U.S.C. § 1415(e)(2) (1990)), which allows this Court to grant all appropriate relief. J.B. further asks that this program include psychological treatment, counseling, and instruction on the acquisition of community living and social skills. While Killingly has agreed to provide J.B. with two-years' compensatory education pursuant to the Hearing Officer's decision, it argues that it is not responsible for funding any treatment services that J.B. requires. DCF contends that it has agreed only to provide J.B. with shelter and treatment services until J.B. turns twenty-one, which will occur on May 21, 1998. It also argues that it has never been responsible for providing J.B. with educational services. Finally, DMH asserts that it is not required to provide J.B. with any special education or related services because it has not yet deemed J.B. eligible for its care. All parties agree that J.B. requires a residential program for his disabilities because he is not yet capable of independently living in the community. Thus, the issue is not whether J.B. requires a residential program, but whether defendants

should fund the non-educational portions of the residential program, including room and board, psychological and counseling services, and instruction on the acquisition of community living and social skills. This Court addresses each of these in turn.

### a. The Costs of Room and Board for a Community–Based Residential Program

 Under federal law, the definition of special education includes instruction in hospitals, institutions, and other settings if it is necessary to meet a child's unique needs. 20 U.S.C. § 1401(a)(16) (1990 & Supp.1997), *amended by* 20 U.S.C. 1401(25) (amended June 4, 1997). The regulations implementing the IDEA provide that if "placement in a public or private residential program is necessary to provide special education and related services to a child with a disability, the program, including non-medical care and room and board, must be at no cost to the parents of the child." 34 C.F.R. § 300.302 (1997).[5] Additionally, section 1412(a)(10)(B) requires states participating in the IDEA to adopt a state plan setting forth policies and procedures to assure that:

> [c]hildren with disabilities in private schools and facilities are provided special education and related services, in accordance with an [IEP], at no cost to their parents, if such children are placed in, or referred to, such schools or facilities by the State or appropriate local educational agency as the means of carrying out the requirements of this subchapter. . . .

20 U.S.C. § 1412(a)(10)(B)(i) (amended June 4, 1997) (amending 20 U.S.C. § 1413(a)(4)(B)(i) (1990 & Supp.1997)). Thus, residential programs are appropriate if they are necessary to allow a disabled child to benefit from special education and related services. *Mrs. B.*, 103 F.3d at 1122 (stating that the "fact that a residential placement may be required . . . due primarily to emotional problems, does not relieve the state of its obligation to pay for the program under federal law so long as it is necessary to

insure that the child can be properly educated"); *Abrahamson v. Hershman*, 701 F.2d 223, 227 (1st Cir.1983); *Ciresoli v. M.S.A.D. No. 22*, 901 F.Supp. 378, 386 (D.Me.1995). If a state does not have the facilities to educate a child with a specific disability, an out-of-state residential placement will be appropriate if it is first approved by the commissioner or the local or regional board of education. Conn.Gen.Stat. § 10–76d(d) (amended as effective on July 1, 1997); *see Vander Malle v. Ambach*, 667 F.Supp. 1015, 1020 (S.D.N.Y. 1987) (noting that a child's placement in an out-of-state residential program in Pennsylvania was appropriate because the New York State Commissioner of Education had approved the specific program).

Presently, J.B. resides at High Meadows under DCF care pursuant to a voluntary agreement with DCF whereby DCF will continue to care for J.B. until he turns twenty-one on May 21, 1998. *See* Conn.Gen .Stat. § 17a–11(d) (1992 & Supp.1997) (providing that the DCF Commissioner has the discretion to care for children currently in DCF facilities until those children turn twenty-one), *amended by* Conn.Gen.Stat. § 17a–11(g) (effective October 1, 1997). While J.B. has been at High Meadows, DCF has provided J.B. with shelter. Thus, DCF's agreement to fund J.B.'s room and board costs while J.B. remains under DCF care renders it unnecessary for this Court to decide at this time whether defendants are required to fund J.B.'s room and board costs and how to apportion such funding. While the funding of room and board expenses is not an issue on this motion for a preliminary injunction, it will arise, however, once J.B. turns twenty-one in May 1998 if no state agency accepts responsibility for these costs.

Even if J.B. satisfies the preliminary injunction standard, he is not necessarily entitled to a change in placement unless this Court finds that a change in placement is warranted as part of the relief available under section 1415(i)(2)(B)(iii) (amended June 4, 1997) (amending 20 U.S.C. § 1415(e)(2) (1990)). J.B. must be moved, however, in

---

**5.** While the Secretary of Education has not yet promulgated regulations to accompany the 1997 Amendments, the regulations to the unamended IDEA have persuasive weight because the versions of the statute are substantively similar on the meaning of a residential treatment program.

May 1998 when he can no longer remain at High Meadows under DCF care. Conn.Gen. Stat. § 17a–11(d) (1992 & Supp.1997), *amended by* Conn.Gen.Stat. § 17a–11(g) (effective October 1, 1997). Section 17a–11(d) does not mandate that supervision over disabled children is limited to DCF facilities. Indeed, section 17a–12 recognizes that a change in placement may be necessary for the best interests of a child, including a transfer to a private facility in Connecticut or another state. Conn.Gen.Stat. § 17a–12(a) (1992 & Supp.1997).

■■■ As a practical matter, this Court finds that J.B. requires a change in placement not only because he must be moved in six months, but also because he poses a danger to himself and the community at High Meadows due to the nature of his disabilities. At the one-day evidentiary hearing, the parties informed this Court that J.B.'s group home, with approximately five other children between the ages of fifteen to seventeen, was scheduled to close soon. Then, J.B. would be moved to a larger dormitory where he would reside with children between the ages of about twelve to seventeen. DCF argues that it would not move J.B. to a dormitory if it thought the placement would be harmful to J.B. or others. Due to the nature of J.B.'s pedophilia disability and his risk of re-offending, however, this Court finds that it is potentially harmful to J.B. and others to place him in an environment with young boys. It is difficult to determine with certainty that J.B. will not re-offend simply because he has not exhibited sexually inappropriate behavior since moving to High Meadows. If J.B. re-offends, he would suffer a significant setback in recognizing those factors leading to his pedophiliac behavior and learning to manage his dissociative identity disorder. Moreover, it is difficult to determine what effects the proposed new setting at High Meadows will have on J.B.'s behavioral stability. Consequently, this Court finds that J.B. should be moved to a different residential program.

**b. Psychological and counseling Services**

J.B. objects to the Hearing officer's finding that the services necessary to treat his pedophilia and multiple personality disorder are not special education or related services, but rather are excludable medical services. DCF claims that this issue is moot because it is planning to provide therapy for J.B.'s pedophilia in the near future, but nevertheless maintains that such services are not "related services" under the IDEA.

Under the IDEA, disabled children are entitled to receive a free appropriate public education which consists of special education and related services. Related services means:

> transportation, and such developmental, corrective, and other supportive services (including speech-language pathology and audiology services, psychological services, physical and occupational therapy, recreation, including therapeutic recreation, social work services, counseling services, including rehabilitation counseling, orientation and mobility services, and medical services, except that such medical services shall be for diagnostic and evaluation purposes only) as may be required to assist a, child with a disability to benefit from special education. . . .

20 U.S.C. § 1401(22) (amended June 4, 1997) (amending 20 U.S.C. § 1401(a)(17) (1990 & Supp.1997)). Under the implementing regulations, a note following the definition of related services states that the list of related services "is not exhaustive and may include other developmental, corrective, or supportive services . . . if they are required to assist a child with a disability to benefit from special education." 34 C.F.R. § 300.16 note (1997).[6]

The regulations define counseling services as "services provided by qualified social workers, psychologists, guidance counselors, or other qualified personnel." 34 C.F.R. & 300.16(b)(2) (1997). Additionally, psychological services includes:

---

**6.** New regulations have not been promulgated for the 1997 Amendments, but the regulations to the unamended version can be followed, *see* foot-

note 5, and this is true for the meaning of related services as it is for the meaning of a residential treatment program.

(i) Administering psychological and educational tests, and other assessment procedures;

(ii) Interpreting assessment results;

(iii) Obtaining, integrating, and interpreting information about child behavior and conditions relating to learning[;]

(iv) Consulting with other staff members in planning school programs to meet the special needs of children as indicated by psychological tests, interviews, and behavioral evaluations; and

(v) Planning and managing a program of psychological services, including psychological counseling for children and parents.

34 C.F.R. § 300.16(b)(8) (1997). Finally, rehabilitation counseling services means "services provided by qualified personnel in individual or group sessions that focus specifically on career development, employment preparation, achieving independence, and integration in the workplace and community of a student with a disability." 34 C.F.R. § 300.16(b)(10) (1997).

The Hearing officer concluded that special education and related services did not include services intended to treat J.B.'s pedophilia and multiple personality disorder. She further found that these services constituted excludable medical services. The medical services exclusion has been interpreted to mean that the state is responsible for providing medical services only for evaluation and diagnostic purposes. *See Irving Indep. Sch. Dist. v. Tatro,* 468 U.S. 883, 891–95, 104 S.Ct. 3371, 3376–78, 82 L.Ed.2d 664 (1984) (discussing the medical services exclusion from the scope of related services). The Hearing Officer reasoned that psychological and counseling services cannot be considered special education or related services if they are intended to treat a child's disability unrelated to learning. Thus, she found that such services would be part of J.B.'s treatment plan for his "psychiatric conditions." This Court notes that the issue of whether defendants are required to provide psychiatric services, as opposed to psychological and counseling services, to J.B. is not before this Court because J.B. has not asserted that he requires these services, except for evaluation or diagnostic purposes. This Court finds that the Hearing Officer reached an incorrect conclusion of law by misconstruing the meaning of related services and the medical services exclusion. Therefore her conclusions on this issue do not warrant due deference.

■ When counseling and psychological services would allow a disabled child to benefit from special education, they are considered related services, and not excludable medical services, to be provided at no cost to the child's parents or guardian. *See Tatro,* 468 U.S. at 894, 104 S.Ct. at 3378 (stating that "only those services necessary to aid a handicapped child to benefit from special education must be provided"); *T.G. v. Board of Educ. of Piscataway,* 576 F.Supp. 420, 424 (D.N.J.1983) (finding that defendant state board of education was required to fund psychotherapy services as a related service where the therapy was intended to allow a disabled child to benefit from his educational program); *Gary B. v. Cronin,* 542 F.Supp. 102, 117 (N.D.Ill.1980) (noting that psychotherapy may be required before a child can benefit from special education); *In re "A" Family,* 184 Mont. 145, 158–60, 602 P.2d 157, 165–66 (1979) (determining that the psychotherapy services provided to an emotionally disturbed child constituted related services). This conclusion is consistent with the plain meaning of 20 U.S.C. § 1401(22) (amended June 4, 1997) (defining related services) (amending 20 U.S.C. § 1401(a)(17) (1990 & Supp.1997)), which specifically states that related services includes psychological and counseling services, 34 C.F.R. § 300.16(b)(2) (1997) (defining counseling services), and 34 C.F.R. § 300.16(b)(8) (1997) (defining psychological services). Moreover, the only court within the Second Circuit to discuss the related services and medical services exclusion required the state defendants to pay for a disabled child's psychotherapy expenses, as related services, because the psychological services were necessary for the child to receive an educational benefit. *Papacoda,* 528 F.Supp. at 72.

■ Thus, the issue is whether J.B. requires counseling and psychological services in order to benefit from special education. The Hearing Officer stated that "[t]here has

been no evidence advanced to show that [J.B.'s] academic needs are intertwined with his emotional problems. [J.B.'s] treatment needs are clearly distinguishable from his academic needs." Also, based on her social-sexual evaluation of J.B., Cox–Lindenbaum found that J.B.'s "sexual offenses are not due to [his] language disorder or low average intelligence." Finally, during the one-day evidentiary hearing, Dr. Robin Grant–Hall, Ph.D., a licensed clinical psychologist, testified that it is practically difficult to separate J.B.'s pedophilia, which is a symptom of his serious emotional problems, from his learning disabilities. She noted that a learning disability would make it more difficult to treat emotional problems because the verbal problems inhibit a discussion of emotional problems. She further stated that language deficits confuse treatment, and stressed that it is necessary to understand a person's cognitive makeup and learning disabilities in order to present the treatment in a manner in which the person will learn.

Neither Cox–Lindenbaum nor Grant–Hall specifically found that treatment of J.B.'s emotional problems would allow J.B. to benefit from special education. Grant–Hall, however, testified that the absence of treatment at High Meadows would make future treatment of J.B. more difficult because he may have become more concrete in his habits. She stated that he could be farther along in addressing his emotional problems if he had received intensive treatment.

Although there is no direct evidence establishing that psychological and counseling services would allow J.B. to benefit from special education, there is ample evidence in the record that J .B. has not made academic progress without psychological and counseling services.

Based on the record, it appears that J.B. has not received any significant counseling since he has been at High meadows, despite Cox–Lindenbaum's recommendations that J.B. required intensive clinical and cognitive treatment. Cox–Lindenbaum had recommended that J.B.'s "comprehensive treatment should include, among other therapies, cognitive retraining to enable [J.B.] to recognize those factors that may lead to re-offend-

ing, deviant arousal training, comprehensive individual and group therapy, social skill development, a stress reduction program, an anger management program, exploration of [J.B.'s] victimization as a child, and psychiatric consultation and evaluation with attention to [J.B.'s multiple personality disorder] and an exploration of the use of psychotropic medications if needed." The Hearing Officer also noted that J.B.'s IEP did not include Cox-Lindenbaum's recommendations to provide J.B. with intensive clinical and cognitive treatment.

Contrary to Cox–Lindenbaum's recommendations, J.B.'s IEP, based on a PPT meeting on March 13, 1996, provided that J.B. would receive only one-half hour per week of counseling. This was a reduction from the two hours per week of counseling he received at Harmony Hill for the 1993–94 school year. J.B.'s IEP dated April 3, 1997 does not indicate that he is currently receiving any counseling or psychological services. Moreover, during the one-day evidentiary hearing, J.B. testified that he has not received any treatment at High Meadows because the facility did not have the proper services to address his disability-related needs. He did state that a therapist is available to speak with him if necessary.

The Hearing Officer found that J.B.'s "academic progress, although less than expected, has occurred even as his progress in the area of overcoming his sexual deviancy and moving toward safe community living has stalled." She also found that J.B.'s academic progress "has been somewhat slow; in six years, between 1991 and 1997, his math and reading scores have increased by approximately two grade levels. The March 13, 1996 PPT found that [J.B.'s] progress was commensurate with his measured ability. It is uncertain whether [J.B.'s] progress was reasonable in light of his ability ."

The record indicates that as of September 1991, J.B.'s reading and math skills were at the fourth grade level, and his writing skills and general knowledge were at the third grade level. By October 1992, J.B. had advanced one grade level and was performing at the fifth grade level. This grade advancement occurred while J.B. was at Harmony

Hill and was receiving counseling services and speech and language therapy in conjunction with his special education classes. For example, J.B.'s special education program for the 1993–94 school year consisted of 27.5 hours per week of special education classes, two hours per week of counseling, and 1.5 hours per week of speech and language services. His program for the 1994–95 school year was substantially different than the previous year, as it called for only 5.5 hours per week of secondary special education classes, which is twenty-two hours less per week than before, and forty-five minutes per week of individual therapy, which is forty-five minutes less per week than before.

After J.B. was transferred to High Meadows, his test results indicated that he was performing academically at a fifth to sixth grade level. His IEP, dated March 13, 1996, called for seventeen hours per week of instruction in regular classes, thirty minutes per week of counseling, and forty-five minutes per week of direct speech and language services. By April 1997, J.B.'s reading skills were at a 6.4 grade level and his spelling skills were a fifth grade level. His math skills were at a 4.6 grade level, but his skills improved with the use of a calculator. Thus, in five years, since 1992, when J.B. was performing at the fifth grade level, J.B. had not advanced at all in his spelling and math skills and had advanced about one-and-a-half grades in his reading skills, although he had previously advanced an entire grade level in one year between 1991 and 1992.

Based on the Hearing officer's findings, the record, and additional testimony taken at the one-day evidentiary hearing, this Court finds that J.B. did not make academic progress and has not received significant psychological or counseling services since he has been at High Meadows.[7] Thus, this Court cannot conclude that J.B. is capable of making academic progress without psychological

and counseling services because there is no evidence to support such a finding. Consequently, at a minimum, J.B. should receive a psychiatric evaluation for diagnostic and evaluation purposes in order to determine the extent of the psychological and counseling services that he needs to benefit from special education. Based on this evaluation, a PPT must be convened to incorporate the psychiatrist's recommendations into an appropriate special education program for J.B.

■ This Court is sensitive to the warning that courts should avoid causing states to incur huge expenditures by requiring states to provide health care. *See Detsel v. Board of Educ. of Auburn Enlarged City Sch. Dist.*, 637 F.Supp. 1022, 1027 (N.D.N.Y. 1986) (holding that constant, in-school nursing care for a severely physically handicapped child falls within the medical services exclusion), *aff'd*, 820 F.2d 587 (2d Cir.), *cert. denied*, 484 U.S. 981, 108 S.Ct. 495, 98 L.Ed.2d 494 (1987); *Clovis Unified Sch. Dist. v. California Office of Admin. Hearings*, 903 F.2d 635, 644 (9th Cir.1990) (considering the extent and nature of the services to be provided to a disabled child in order to determine whether the services constituted excludable medical services). We further note that the IDEA is not intended to allow each disabled child to realize his or her maximum potential. *Rowley*, 458 U.S. at 189–90, 102 S.Ct. at 3042. Yet, the IDEA mandates that states cannot avoid their responsibilities under the IDEA by asserting that they lack the resources to provide special education and related services to disabled children.[8] As the comment to the implementing regulations states, a state agency responsible for providing IEP services may do so indirectly, for example, by contracting with another public or private entity. 34 C.F.R. pt. 300 app. C (1997) (discussing whether a public agency must itself directly provide the ser-

---

7. DCF argues that even if the state provides J.B. with psychological and counseling services "there is good reason to believe that he will not benefit appreciably anyway from such treatment, given the fact that he has already received intensive treatment for pedophilia for nearly four years at Harmony Hill and continued to demonstrate inappropriate and escalating behavior." Contrary to this assertion, the record indicates

that J.B. was only receiving forty-five minutes to two hours per week of counseling at Harmony Hill.

8. For this reason, we reject Killingly's argument that it should not be responsible for J.B.'s treatment needs because they "are beyond the competence of any public school system."

vices set forth in a child's IEP). Thus, if defendants are unable to provide J.B. with the special education and related services to which he is entitled under the IDEA, they must locate other public or private entities that are able to provide these services.

### c. Acquisition of Community Living and Social Skills

■■■ The Hearing Officer found that defendants were not responsible for providing J.B. with instruction in acquiring socialization or community living skills because these were not considered related services within the meaning of the IDEA. She acknowledged that "[l]earning how to function in a work place, making sense of a community's transportation system, managing a checkbook, paying bills, shopping for and preparing food may all fall within the rubric of special education." She found, however, that the acquisition of these skills does not become special education or related services when the true purpose is to treat J.B.'s pedophilia and multiple personality disorder.

This Court finds that J.B. is entitled to instruction in the acquisition of community and daily living skills because these skills fall within the scope of special education. In the amended version of the IDEA, Congress stated that the purpose of the IDEA is to ensure that the special education and related services which disabled children receive are designed to "prepare them for employment and independent living." 20 U.S.C. § 1400(d)(1)(A) (amended June 4, 1997) (amending 20 U.S.C. § 1400(c) (1990 & Supp. 1997)). Moreover, several courts have noted that the definition of special education may be broad depending on a disabled child's unique needs because Congress intended to provide all disabled children with a free appropriate public education "regardless of the severity of their disabilities." 20 U.S.C. § 1412(a)(3)(A) (amended June 4, 1997) (amending 20 U.S.C. § 1412(2)(C) (1990 & Supp .1997)); see Abrahamson, 701 F.2d at 228 (rejecting the argument that a severely retarded child's program could not be consid-

ered educational because it consisted of learning skills of daily life); Kruelle v. New Castle County Sch. Dist., 642 F.2d 687, 693 (3d Cir.1981) (noting that for some severely retarded children, "the concept of education is necessarily broad"); Battle by Battle v. Com. of Pennsylvania, 629 F.2d 269, 275 (3d Cir.1980) ("Where basic self help and social skills such as toilet training, dressing, feeding and communication are lacking, formal education begins at that point."); Vander Malle, 667 F.Supp. at 1038 (stating that "when necessary an appropriate education must provide training in rudimentary social and personal skills").

Additionally, the instruction that J.B. requests constitutes transition services to which he is entitled pursuant to 20 U.S.C. § 1401(30) (amended June 4, 1997) (amending 20 U.S.C. § 1401(a)(19) (1990 & Supp. 1997)).[9] As defined in the implementing regulations, transition services include instruction, community experiences, the development of employment and other post-school adult living objectives, and, if appropriate, the acquisition of daily living skills and functional vocational evaluation. 34 C.F.R. § 300.18(b)(2) (1997). Finally, a note following these regulations provides that "[t]ransition services for students with disabilities may be special education, if they are provided as specially designed instruction, or related services, if they are required to assist a student with a disability to benefit from special education." 34 C.F.R. § 300.18 note (1997). Accordingly, J.B. could receive instruction in community living and social skills, including daily living skills, appropriate behavior, socialization, and working skills, as part of his transition services.

### 5. Financial Responsibilities of Killingly, DCF, and DMH During the Pendency of These Proceedings

■■■ Under the amended version of the IDEA, a state's chief executive officer remains ultimately responsible for ensuring that all disabled children receive a free appropriate public education by implementing

---

9. This Court notes that the modified definition of transition services includes related services. 20 U.S.C. § 1401(30)(C) (amended June 4, 1997) (amending 20 U.S.C. § 1401(a)(19) (1990 & Supp.1997)).

interagency agreements. 20 U.S.C. § 1412(a)(12)(A) (amended June 4, 1997) (amending 20 U.S.C. § 1412(6) (1990 & Supp. 1997)). The interagency agreements must include a statement delineating the financial responsibility of the public educational and noneducational agencies, mechanisms for allowing a local educational agency to seek reimbursement from other agencies, procedures for resolving interagency disputes, and procedures for coordinating services between agencies. 20 U.S.C. § 1412(a)(12)(A)(i)–(iv) (amended June 4, 1997) (amending 20 U.S.C. § 1413(a)(13) (1990 & Supp.1997)). The provision describing agency financial responsibility further states that if a non-educational public agency is obligated to provide services to a disabled child pursuant to an interagency agreement or state or federal law, that agency's financial responsibility shall precede the financial responsibility of the local educational agency. 20 U.S.C. § 1412(a)(12)(A)(i) (amended June 4, 1997). If, however, that agency fails to pay for or provide any required special education or related services, the local educational agency must pay for or provide such services and seek reimbursement from the delinquent agency. 20 U.S.C. § 1412(a)(12)(B)(ii) (amended June 4, 1997).

The Senate Report on the 1997 Amendments explains that:

[t]he bill strengthens the requirements on ensuring provision of services by non-educational agencies while retaining a single line of responsibility. The chief executive officer of a State must develop and implement interagency agreements and reimbursement mechanisms to ensure that educational agencies have access to funding from non-educational public agencies that are responsible for services that are also necessary for ensuring a free appropriate public education to children with disabilities.

A provision is added to the Act to strengthen the obligation to ensure that all services necessary to ensure a free appropriate public education are provided through the coordination of public educational and non-educational programs. This subsection is meant to reinforce two

important principles: (1) that the State agency or (local educational agency) responsible for developing a child's IEP can look to noneducational agencies, such as Medicaid, to pay for or provide those services they (the noneducational agencies) are otherwise responsible for; and (2) that **the State agency or [local educational agency] remains responsible for ensuring that children receive all the services described in their IEP's in a timely fashion, regardless of whether another agency will ultimately pay for the services.** S.Rep. No. 105–17, at 11–12 (1997) (emphasis added). Thus, both the amended statute and congressional intent indicate that Killingly remains primarily responsible for ensuring that J.B. receives special education and related services during the pendency of these proceedings. Killingly may later seek reimbursement from either DCF or DMH if they are adjudicated to be fully or partially responsible for providing J.B. with special education or related services pursuant to an interagency agreement or state or federal law.

The issue of the appropriating the costs of J.B.'s placement between Killingly, DCF, and DMH would ordinarily be resolved in a due process administrative hearing. *School Comm. of Burlington v. Dep't of Educ. of Mass.*, 471 U.S. 359, 371, 105 S.Ct. 1996, 2003, 85 L.Ed.2d 385 (1985) (stating that the due process procedures apply to determinations of which agency remains financially responsible); *see K.P.*, 891 F.Supp. at 714 (stating that the "question of financial responsibility should be raised, in the first instance, in a due process administrative hearing by joining as parties the appropriate state agencies"); *Vander Malle*, 667 F.Supp. at 1030 (finding that funding determinations are reviewable under the IDEA's due process procedures). In *Barbara Z.*, the district court stated that it had the power to apportion the attorney's fees to which the child's parents were entitled because the lack of an interagency agreement contributed to the litigation. 937 F.Supp. at 716. Although this Court could refer the issue of the agencies' financial responsibilities to an administrative due process hearing, issues of efficiency dictate that it will be appropriate to resolve this

issue after a full hearing on the merits as to defendants' responsibilities under the IDEA.

### 6. Promissory Estoppel

Plaintiff also asserts a claim of promissory estoppel against defendant DMH based on representations that DMH allegedly made during the state administrative hearing. On September 4, 1996, DMH allegedly promised to provide J.B. with a community-based residential placement. According to the Hearing Officer, this plan never materialized because DMH lacked the finances to fund such a program.

Based on our ruling as to which agency bears financial responsibility for the components of J.B.'s special education program and residential placement, we need not rule on this issue at this time. We will defer ruling on this until after a full hearing on the merits.

### CONCLUSION

This Court finds that J.B. has met the standard for issuing a preliminary injunction. He has shown a substantial likelihood of success on the merits because defendant Killingly failed to follow the IDEA's procedural requirements. He has also established irreparable harm by showing that he has been denied the right to a free appropriate public education. To remedy this emergency situation, this court grants plaintiff's motion for a preliminary injunction and orders the defendants as follows.

The parties are instructed to convene a PPT meeting within thirty days to prepare an IEP for J.B., based on his unique needs, that complies with the requirements of section 1414(d) (amended June 4, 1997) (amending 20 U.S.C. § 1401(a)(20) (1990 & Supp. 1997)). In order to provide a statement in the IEP as to J.B.'s current level of education, it may be necessary to conduct testing to determine this level. J.B.'s IEP must also include a statement of the transition services that he will receive pursuant to 20 U.S.C. § 1401(30) (amended June 4, 1997) (amending 20 U.S.C. § 1401(a)(19) (1990 & Supp. 1997)). Lastly, as part of J.B.'s special education program, his IEP must include instruction on the acquisition of community

and daily living skills. During the pendency of these proceedings, Killingly is financially responsible for providing J.B. with special education (including transition services) and related services.

■ A psychiatric evaluation should be conducted for diagnostic and evaluation purposes to specifically determine the type and the extent of psychological and counseling services that J.B. requires in order to benefit from special education. Killingly will be required to pay for this evaluation because it is necessary before a PPT can properly decide the components of J.B.'s IEP. Moreover, if the psychiatrist determines that J.B. requires psychological and counseling services to benefit from special education, Killingly must fund these services and ensure that J.B. receives these services during the pendency of these proceedings.

Finally, the PPT must decide upon an appropriate residential placement for J.B. during the pendency of these proceedings, a placement which should continue while J.B. receives the two-years' compensatory education. If the PPT concludes that, Connecticut does not have the requisite program, it shall locate a public or private out-of-state facility capable of providing the services listed in J.B.'s IEP. During the pendency of these proceedings, DCF is ordered to fund the room and board costs of the placement.

This is an interim decision based on an emergency situation. This Court is aware of the high cost, approximately $150,000 per year, involved in providing J.B. with a group home. Killingly and DCF, however, will be able to seek reimbursement for some or all of these costs once the issue of the agencies' financial responsibilities is decided.

**SO ORDERED.**