**A. S., by Her Parents & Next Friends Mr. and Mrs. S.**

v.

**NORWALK BOARD OF EDUCATION**

No. 3:99CV002 (SRU), 3:99CV003 (SRU).

United States District Court, D. Connecticut.

Feb. 13, 2002.

David C. Shaw, Law Offices of David C. Shaw, Hartford, CT, for Plaintiff.

Marsha Belman Moses, Michelle Claire Laubin, Berchem, Moses & Devlin, P.C., Milford, CT, for Defendant.

### RULING AND ORDER RE: CROSS–MOTIONS FOR SUMMARY JUDGMENT

UNDERHILL, District Judge.

These consolidated cases concern a special education due process administrative hearing under the Individuals with Disabilities Education Act, 20 U.S.C. § 1415 et seq. (the "IDEA"). Specifically, A.S. ("A."), acting through her parents, seeks to affirm the 1998 decision of an administrative hearing officer (the "Hearing Officer") holding that A.'s educational program was inappropriate, but that she should remain in regular education classes and be provided with additional supportive services. The Hearing Officer also required the Norwalk Board of Education (the "Board") to pay for the independent evaluation performed by Ruth Hamilton, Ph.D. ("Hamilton"), a consultant hired by A.'s parents. In addition to affirmance of the Hearing Officer's decision, A. also seeks an award of attorneys' fees and costs under 20 U.S.C. § 1415(i)(3) as the prevailing party

in the administrative hearing. The Board seeks to overturn the decision of the Hearing Officer and argues that it should not be required to pay for the work performed by Hamilton.

Pending are the parties' cross-motions for summary judgment on all issues except A.'s claim for attorneys' fees and costs. A careful review of the record demonstrates that the Hearing Officer did not err in ordering that A. remain in the regular education environment and be provided with additional supportive services. Specifically, the Hearing Officer correctly applied the mainstreaming test set forth in *Oberti v. Bd. of Educ. of the Borough of Clementon Sch. Dist.*, 995 F.2d 1204 (3d Cir.1993). In addition, the Hearing Officer did not err in requiring the Board to reimburse the costs of Hamilton's evaluation. Accordingly, A.'s motion for summary judgment is granted and the Board's motion for summary judgment is denied.

## FACTS

A. has been diagnosed as neurologically impaired and visually handicapped.[1] She is, therefore, eligible for special education with supplemental aids and services under the IDEA. A. participated in the Board's Developmental Handicapped program (the "DH Program"), a segregated setting for disabled students, until she reached the fourth grade. After a 1991 due process hearing, A. was placed in a mainstream fourth grade class with an aide and an independent consultant. A. successfully remained in that regular education setting through fifth and sixth grade. A.'s seventh grade year was also successful, although she had begun to exhibit behavioral problems. Although A. made some progress towards her IEP goals during eighth grade, most of her goals were not mastered and had to be continued to the next school year. A. also exhibited behavioral problems during that year, however, strategies were developed throughout the year that significantly reduced the problems.

In anticipation of A.'s first year of high school, the Board recommended that she be placed back in the DH Program. Under the Board's proposal, A. would have participated in vocational training outside the school, focused on life skills training, and be mainstreamed only in selected non-academic classes. A.'s parents objected to the Board's proposed change. A. was, therefore, placed in a regular education setting with Independent Education Plan ("IEP") goals unchanged from the prior school year. She was provided with several supportive services and modifications were made to the regular education curriculum.

At a January 1997 Planning and Placement Team ("PPT") meeting, the Board renewed its argument that A.'s placement in the regular education environment was not appropriate. The Board maintained that A. should be placed in the DH Program and be mainstreamed only in selected non-academic classes.[2] A.'s parents again objected to the proposed change.

---

1. At a September 28, 1999 PPT meeting, A.'s designation, with the consent of all parties, was changed to "Trainable Mentally Retarded."

2. The precise parameters of the Board's proposed plan are less than clear. In the Justification Statement (B96–97) prepared in advance of the November 14, 1996 PPT meeting, the Board proposed that A. be placed in the DH Program for 23.5 hours a week, and be mainstreamed for art, lunch and vocational transition services for 6.5 hours a week. Mrs. S. requested a PPT meeting to discuss this proposal, but one was never held. The minutes from the January 21, 1997 PPT meeting, however, indicate that the plan was offered for discussion at that meeting. (B97–18 at 15.) The minutes from the January 21 meet-

The Board and A.'s parents thereafter filed separate requests for a due process hearing. The requests were consolidated and an administrative hearing was held on twenty-one separate days over the course of twenty-two months. The hearing addressed the following four issues: (1) was A.'s 1996–1997 program appropriate; (2) was the program proposed by the Board appropriate; (3) should the Board be required to pay for the independent evaluation done by Hamilton; and (4) did the Board violate, the IDEA's mainstreaming requirement, 20 U.S.C. § 1412(a)(5)(A),[3] with respect to the 1996–1997 school year?

In his final order, the Hearing Officer concluded that A.'s placement during the 1996–1997 school year was not appropriate. He also found, however, that the alternative placement proposed by the Board was not appropriate. The Hearing Officer thus ordered A.'s PPT to reconvene and begin planning a new IEP for A.

He ordered that A. "remain in the regular education classroom with supplementary aides and services including but not limited to direct services from the special education teacher and a paraprofessional." (AR–42 at 11.) Finally, the Hearing Officer required the Board to pay the cost of A.'s consultant, Hamilton.

### STANDARD OF REVIEW

Under the IDEA, when a federal court reviews the findings and conclusions reached in a state administrative proceeding, it must base its decision on the preponderance of the evidence, after reviewing the administrative record and, at a party's request, any additional evidence presented.[4] 20 U.S.C. § 1415(i)(2)(B); *M.S. v. Bd. of Educ. of the City Sch. Dist. of the City of Yonkers*, 231 F.3d 96, 102 (2d Cir.2000); *Mrs. B. v. Milford Bd. of Educ.*, 103 F.3d 1114, 1116 (2d Cir.1997). This

---

ing indicate that A. would be mainstreamed for lunch, art, physical education and computers for 14 hours a week, and that the remainder of her time would be spent in the DH Program. (*Id.* at 8 & 13.) In apparent contrast, another portion of the minutes reflects that A. would be provided with "increased special education services (14 hours per week.)" (*Id.* at 1.) (parentheses in original).

It is clear from the testimony of Richard Follman, Housemaster at Norwalk High School, that, irrespective of the precise time breakdown, A. would receive the bulk of her education in the DH Program and also receive her therapeutic services (i.e., speech, language, physical, and occupational therapy and services of the visually impaired) in a segregated setting. The remainder of A.'s time would then be spent in mainstream non-academic classes and lunch. Thus, regardless of the exact nature of the Board's proposed program, the parties do not dispute that it would have been more restrictive than A.'s then current placement.

3. Section 1412(a)(5)(A) of the IDEA requires that "[t]o the maximum extent appropriate,

children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily."

4. The parties have supplemented the record to include information concerning A.'s placement since the January 1997 PPT meeting. The parties do not dispute that A.'s current placement has been a resounding success. Specifically, A. thrived first in a mixture of regular education classes (with modifications to her IEP and the provision of additional supportive services), extracurricular activities, and vocational training in the Norwalk community. Each party argues that A.'s current success supports its respective arguments. At the time of the parties' submissions of briefs in this case, A. was scheduled to participate full-time in a community-based vocational program.

"'is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review.'" *M.S.*, 231 F.3d at 102 (quoting *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 206, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982) ("*Rowley*")). Rather, the reviewing court must "give 'due weight' to [the administrative] proceedings, mindful that the judiciary generally 'lack[s] the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy.'" *Id.; see also Naugatuck Bd. of Educ. v. Mrs. D*, 10 F.Supp.2d 170, 176–77 (D.Conn.1998) (This "modified de novo review contemplates an intermediate standard of review ... [that] requires a more critical appraisal of the agency determination than clear-error review entails, but which nevertheless, falls well short of complete de novo review ... the [district] judge is not at liberty either to turn a blind eye to administrative findings or to discard them without sound reason.") (citations omitted) (brackets in original). Reviewing courts, however, need not give due weight to conclusions of law concerning the "proper interpretation of the federal statute and its requirements." *J.B. v. Killingly Bd. of Educ.*, 990 F.Supp. 57, 67 (D.Conn.1997) (quoting *Mrs. B.*, 103 F.3d at 1121); *see also Naugatuck Bd. of Educ.*, 10 F.Supp.2d at 180.

Finally, "[s]ummary judgment appears to be the most pragmatic procedural mechanism in the Federal Rules for resolving IDEA actions." *Wall v. Mattituck–Cutchogue Sch. Dist.*, 945 F.Supp. 501, 508 (E.D.N.Y.1996) "The inquiry, however, is not directed to discerning whether there are disputed issues of fact, but rather, whether the administrative record, together with any additional evidence, establishes that there has been compliance with IDEA's processes and that the child's educational needs have been appropriately addressed." *Id.*

## DISCUSSION

As the Hearing Officer succinctly stated, "[t]he parties have the best interest of [A.] at heart. Their only difference is where the student shall receive her education ...." (AR–42 at 8.) Specifically, the parties agree that A. was not benefitting from the educational program in place at the beginning of her freshman year. They strenuously disagree, however, as to whether A.'s lack of progress required that she be removed from her academic regular education classes and placed in a much more restrictive program, or whether she should have remained in academic regular education classes and be provided with additional supportive services. The Board sees A.'s struggles in her regular education placement as an indication that she can not receive a meaningful education there. A.'s parents see her difficulties as an indication that she has not been provided with sufficient supplemental services to make a regular education placement work.

The Hearing Officer agreed with the parties that A.'s program, as it existed during the 1996–1997 year, was not appropriate. He further found that A.'s IEP goals were "planned with little thought to [her] unique needs," and therefore ordered that the goals be revised and A. be provided with additional supplemental services in the regular education setting. (AR–42 at 11.) Finally, the Hearing Officer held that the Board should pay for A.'s expert consultant, Hamilton. For the reasons set forth below, the court finds no fault with the hearing officer's conclusions.

## A. THE HEARING OFFICER APPLIED THE CORRECT LEGAL

**STANDARD [5]**

■ Under the IDEA, state educators must strive to provide special education and related services in the least restrictive environment ("LRE") consistent with a child's needs. *Walczak v. Florida Union Free Sch. Dist.*, 142 F.3d 119, 132 (2d Cir.1998); *J.B. v. Killingly Bd. of Educ.*, 990 F.Supp. at 65; 20 U.S.C. § 1412(a)(5)(A). States receiving money under the IDEA, "to the maximum extent appropriate," must educate handicapped children "with children who are not handicapped." *Rowley*, 458 U.S. at 181, 102 S.Ct. 3034. The Hearing Officer, applying *Daniel R.R. v. State Bd. of Educ.*, 874 F.2d 1036 (5th Cir.1989) ("*Daniel R.R.*"), and *Oberti v. Bd. of Educ. of the Borough of Clementon Sch. Dist.*, 995 F.2d 1204 (3d Cir.1993) ("*Oberti*"), concluded that the Board's proposed program did not satisfy the IDEA's LRE requirement. He therefore ordered that A.'s PPT reconvene to create a new IEP, and that A. be provided with additional supplemental services in the regular education environment.

■ The Board argues that the Hearing Officer erred in refusing to apply *Rowley*, and instead applying *Daniel R.R.* and *Oberti*. Specifically, the Board argues that *Rowley* stands for the fundamental IDEA principle that a child must be provided with an educational program that is "sufficient to confer some educational benefit upon the handicapped child." (Def's Memo. at 5.) Once the Hearing Officer determined that A. was not meeting the goals of her IEP in the regular classroom

setting, and therefore necessarily not receiving a free appropriate public education ("FAPE"), the Board argues, it was error for the Hearing Officer to require the Board to provide A. with additional supplementary services in the regular classroom. (*Id.* at 5–7.) Thus, the Board concludes, the Hearing Officer "imposed a 'new' duty on the Board ... which ... has never before been imposed on a school district in the name of 'supplementary aids and services' under IDEA." (*Id.* at 8–9.)

The Board misreads both the Hearing Officer's decision and applicable case law. The Hearing Officer's decision does literally state that "the *Rowley* test is not applicable to questions of mainstream placement." (AR–42 at 8.) It goes on, however, to explicitly rely on the tests set forth in *Oberti* and *Daniel R.R.* Those cases do not abandon *Rowley* and the IDEA's FAPE requirement. Rather, they simply observe that the test set forth in *Rowley* for determining whether the IDEA's FAPE requirement has been met is ill suited to determining compliance with the IDEA's mainstreaming requirement. *See, e.g., Mavis v. Sobol,* 839 F.Supp. 968, 982 (N.D.N.Y.1993) ("A number of Circuit Courts have acknowledged, though that [the *Rowley* ] two-part test is not particularly useful in a case such as the present one where the issue is whether the IDEA's mainstreaming requirement has been satisfied.").

Although there is no question that *Rowley* demarcates an outer limit to the IDEA's LRE preference,[6] *Rowley* does not

---

5. The Board has not briefed several issues asserted in its Complaint. Because the parties have treated the cross-motions for summary judgment as dispositive of all issues in the case (except A.'s parents' claim for attorneys' fees), the court deems those issues abandoned by the Board.

6. Specifically, *Rowley* recognizes that "despite [the IDEA's] preference for 'mainstreaming' handicapped children ... Congress recognized that regular classrooms simply would not be a suitable setting for the education of many handicapped children. The Act [thus] expressly acknowledges that 'the nature or severity of the handicap may

provide guidance for determining whether, in a specific case, the IDEA's LRE requirement has been met. Rather, an extensive body of post-*Rowley* case law has developed offering analyses useful for determining if a child has been mainstreamed to the maximum extent appropriate. Those cases recognize the overlap, and sometime tension, between the IDEA's FAPE and LRE requirements, and set forth tests to be used in specific cases implicating the IDEA's LRE requirement. *See, e.g., Sacramento Unified Sch. Dist., Bd. of Educ. v. Rachel H.,* 14 F.3d 1398 (9th Cir.1994); *Roncker v. Walter,* 700 F.2d 1058 (6th Cir.1983), *cert. denied,* 464 U.S. 864, 104 S.Ct. 196, 78 L.Ed.2d 171 (1983). The analysis applied by the Hearing Officer (i.e., *Oberti/Daniel R.R.*) is simply one such test.[7] Thus, although the Hearing Officer's disavowal of *Rowley,* read literally, was perhaps a bit of an overstatement, it was not a material error.

Moreover, the Board has presented no compelling reason why the court should ignore the well developed body of post-*Rowley* case law and, instead, apply solely the general language in *Rowley* itself, a non-mainstreaming case. To the contrary, the Board implicitly recognizes the limited applicability of *Rowley* in mainstreaming cases by applying the *Daniel R.R./Oberti* test in its papers. (*See* Def's Memo. at 18.) Finally, the Board reads *Rowley* too narrowly. That decision states, in pertinent part, that only "if personalized instruction is being provided *with sufficient supportive services to permit the child to benefit from the instruction,*" will the child receive a " 'free appropriate public edu-

cation' as defined by the Act." *Rowley,* 458 U.S. at 189, 102 S.Ct. 3034 (emphasis added). Thus, it is simply not enough to state that a more restrictive environment was appropriate because A. was not thriving in the regular education classroom. Rather, *Rowley* itself requires an examination of the adequacy of the services being provided in the mainstream setting. The Hearing Officer did not commit legal error in refusing to attempt to apply *Rowley* and instead applying *Daniel R.R.* and *Oberti.*

**B. THE HEARING OFFICER DID NOT ERR IN CONCLUDING THAT A.'S IEP GOALS WERE INAPPROPRIATE**

Before turning to the Hearing Officer's application of the *Daniel R.R./Oberti* test to the facts of this case, it is necessary to address an issue raised by the Board that informs the analysis: whether and when the Board was required to review the appropriateness of A.'s IEP goals. Specifically, the Board argues that the Hearing Officer erred in requiring the Board to propose a new IEP prior to changing A.'s placement. (Def's Opp. Memo. at 19–21.) A.'s parents seek to uphold his conclusion that the Board should have reviewed the goals prior to recommending a change in placement.

The relevant legal framework is clear. A student's IEP must be reasonably calculated to provide some "meaningful" benefit. *Rowley,* 458 U.S. at 192, 102 S.Ct. 3034. "[I]f personalized instruction is being provided with sufficient supportive services to permit the child to benefit from the instruction," then the child is receiving

---

be such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.' " *Rowley,* 458 U.S. at 181 n. 4, 102 S.Ct. 3034, *citing* 20 U.S.C. § 1412(5).

7. The Board does not argue that the Hearing Officer should have applied a mainstreaming test other than *Daniel R.R./Oberti,* even though other Circuits have adopted arguably different tests.

a "'free appropriate public education' as defined by the Act." *Rowley*, 458 U.S. at 189, 102 S.Ct. 3034. Educators must, therefore, consider "whether education in the regular classroom may be achieved satisfactorily with supplemental aids and services ... prior to and during the development of the [child's] IEP." *Greer v. Rome City Sch. Dist.*, 950 F.2d 688, 696 (11th Cir.1991). The consideration of supplemental services must occur at that time so that the child's parents are meaningfully included in the process and so that school officials will not be permitted to "determine what they believe to be the appropriate placement for a handicapped child and then attempt to justify this placement only after the proposed IEP is challenged by the child's parents." *Id.* Moreover, if the child's PPT team recommends any changes in a child's IEP, it is required to base its recommendations "upon the child's current individualized education program and any information relating to the child's current educational performance." *Id.*

■ It is undisputed that A. failed to meet 33 of her 35 IEP objectives. It is also undisputed that many of these unmet goals had been carried over from as much as three prior school years. In addition, the Board's independent educational consultant testified that, although she felt A.'s IEP was "generally ... appropriate," she believed "there [were] a few objectives that have been included that [were] unclear to [her], and perhaps [were] inappropriate for [A.]." (Tr. Beninghof 9/15/97 at 74.) Faced with this situation, the Board was required, at the very least, to review and, if necessary, revise A.'s IEP goals at the end of the school year, if not sooner. Conn. Agencies Regs. § 10–76d–11 (After

an IEP is in place, the PPT team must then "review and, if appropriate, revise each child's individualized education program periodically but not less than annually ...."). The Hearing Officer thus correctly required the Board to reassess and, if necessary, revise A.'s IEP goals prior to recommending a change in placement.

## C. THE HEARING OFFICER DID NOT ERR IN APPLYING THE *OBERTI* TEST

■ In *Oberti*, the court set forth several non-exclusive factors to assist "in determining whether a child with disabilities can be educated satisfactorily in a regular class with supplemental aids and services ...."[8] *Oberti*, 995 F.2d at 1217. These non-exclusive factors include: "(1) whether the school district has made reasonable efforts to accommodate the child in a regular classroom; (2) the educational benefits available to the child in a regular class, with appropriate supplementary aids and services, as compared to the benefits provided in a special education class; and (3) the possible negative effects of the inclusion of the child on the education of the other students in the class." *Id.* at 1218. In this case, each factor individually, and all of the factors collectively, weigh in support of the Hearing Officer's conclusion that A. should have continued in the regular classroom setting with the benefit of additional supportive services.

*1. The Board did not make reasonable efforts to accommodate A. in a regular classroom because it did not consider a broad spectrum of appropriate supplemental services available.*

The Hearing Officer found that the Board took many meaningful steps to try

---

8. Although the Hearing Officer cited both to *Oberti* and *Daniel R.R.*, the court will apply the test as specifically set forth in *Oberti* because *Oberti* incorporates the language in

*Daniel R.R.*, the two tests do not substantially differ, and the parties rely on the *Oberti* language in their briefs.

to keep A. in the regular classroom.[9] Specifically, he found that the Board provided A. with a full time instructional aide, a consulting special education teacher, educational consultants, a behavioral consultant, a physical and occupational therapist, a speech and language therapist and a teacher of the visually impaired. In addition, he found that the Board facilitated several modifications to the regular education curriculum to accommodate A.

The Hearing Officer went on to conclude, however, that despite these substantial efforts, "certain elements of the purported IEP were planned with little thought to [A.'s] unique needs," because, "[t]here was no discussion on the inclusion of the special education teacher in the regular classroom with the student in order to providing [sic] her with direct special education services, rather than leave the student to receive educational directions from an aide or a regular education teacher who does not have the expertise of a special education teacher." [10] (AR–42 at 11.) The Hearing Officer further concluded that:

> [A.] was not receiving FAPE even with the modifications made to her academic program and the instructions given to ·the para professional by the special education teacher. The student can still benefit from the her [sic] placement in a regular class. The PPT did not carefully examine the educational benefits of retaining the student in regular class with intensive instructions in the nonacademic portions of regular education by direct service of her special education teacher or additional consultant time.

(*Id.*) Thus, although the Board provided A. with substantial supplemental aids and services, the Hearing Officer concluded that it failed to consider a broader range of appropriate services (i.e., intensive instruction from a special education teacher and additional consultant time), prior to advocating for her removal from the regular education setting.

The record amply supports the Hearing Officer's conclusion. First and foremost, the minutes from the January 21, 1997 PPT at which the decision was made to remove A. from her regular education academic class contain no discussion of the possibility of providing A. with direct instruction from a special education teacher

9. A.'s parents raise several compelling arguments as to why many of the services provided by the Board were inappropriate, insufficient, or mischaracterized. As discussed below, however, assuming that the services the Board actually provided A. were appropriate, the court nevertheless concludes that the board failed to make reasonable efforts to accommodate A. because it did not consider the broad spectrum of appropriate supplemental services available. The court need not, therefore, review the Hearing Officer's finding on this issue.

10. The Board takes issue with the fact that the Hearing Officer ordered the Board to provide A. with the direct services of a special education teacher and increased consultant involvement despite the fact that A.'s parents did not request the services and none of the Board's consultants recommended the services. Even assuming these facts as true, the Board has failed to demonstrate that the Hearing Officer exceeded his broad statutory grant of authority. *See* Conn. Gen.Stat. § 10–76h (d)(1) ("The hearing officer ... shall have the authority to confirm, modify, or reject the identification, evaluation or educational placement of or the provision of a free appropriate public education to the child or pupil, to determine the appropriateness of an educational placement where the parent or guardian of a child requiring special education or the pupil if such pupil is an emancipated minor or eighteen years of age or older, has placed the child or pupil in a program other than that prescribed by the planning and placement team, or to prescribe alternate special educational programs for the child or pupil.").

in the regular classroom environment. Specifically, the minutes reflect that the PPT found that A. "would benefit from increased special education," (B97–18 at 8), but then concluded that such services would be provided only in either a self-contained classroom or resource room. (*Id.* at 13.) The minutes also do not reflect any discussion of increased consultant involvement with A. The testimony of Bruce Garrison, an advocate with the Office of Protection and Advocacy, who attended the January 21, 1997 PPT meeting, corroborates the version of events reflected in the minutes. (Tr. Garrison 9/15/97 at 177–79.) Finally, despite the fact that the Hearing Officer did not limit the scope of the additional supplemental services that could be provided, the Board has presented no evidence that it considered the following possible sources of support to A., all of which A.'s experts identified as appropriate: the Circle of Friends program (in which A. had demonstrated success in middle school), peer tutoring, scripting, additional staff training and extracurricular activities (in which A. is now enrolled and is indisputably thriving).

The Board incorrectly points to the testimony of Richard Follman, the Housemaster of Norwalk High School, and Joan Foley, A.'s special education teacher, as supporting a contrary conclusion. Specifically, the Board relies on Follman's testimony that he only recommended A. be placed in the DH Program "after reviewing the information and hearing everything that was said at the table and making ... visitations to" observe A. at the West Rocks Middle School. (Tr. Follman 4/18/97 at 132; and 6/9/97 at 58.) It also relies on Foley's testimony that the PPT discussed "[e]verything, from various de-

livery of service [options] to [the] most restrictive [environment]," prior to deciding on A.'s placement. (Tr. Foley 6/10/97 at 62.) The cited testimony, however, refers to actions done in anticipation of A.'s initial transition from the West Rocks Middle School to Norwalk High School. Neither review was done specifically in preparation for the January 21, 1997 PPT, at which the Board sought to remove A. from the regular education environment, and therefore both necessarily were done without out the benefit of knowing how A. was actually faring in the regular education environment. In addition, the cited testimony is simply too broad and vague to reasonably support the conclusion that the Board in fact considered providing direct assistance from a special education teacher in the regular education classroom, an increased role for the Board's consultants, or the other supplemental services identified by A.'s experts.

The Board also implicitly argues that the direct services of a special education teacher in the regular education classroom would not be "appropriate." [11] The Board incorrectly asserts that the testimony of Foley supports its argument that direct instruction could not be properly supplied in the regular education environment. Foley testified that direct one-on-one instruction between a special education teacher and student can take place in regular education setting, "but it's very difficult." (Tr. Foley 6/10/97 at 127.) Certainly, supplemental services or aids could be so patently burdensome or difficult that they would not be appropriate. The fact that they may be "difficult" to provide, however, does not necessarily render them inap-

---

11. The Board makes no such argument with respect to an increased consultant role or the supplemental services recommended by A.'s experts, but not specifically mentioned in the Hearing Officer's decision.

propriate.[12] Furthermore, A.'s experts testified that the services could be provided in a regular education setting. (*See, e.g.,* Tr. Beninghoff 9/15/97 at 54; Librandi 1/14/98 at 77.)

Thus, although the Board provided A. with support in the regular education classroom, (support which the court is willing to assume *arguendo* was appropriate), the Hearing Officer did not err in concluding that the Board should have considered additional services prior to removing A. from the regular education classroom. *Cf. Girty v. Sch. Dist. of Valley Grove,* 163 F.Supp.2d 527 (W.D.Pa.2001) (applying *Oberti,* court held that although board "placed [student] in a regular education setting and provided him with an aide and materials, it did not meaningfully attempt to instruct him inclusively as required under the IDEA."). This is because the IDEA requires that, "to the maximum extent appropriate," children with disabilities should be "educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment [should] occur[ ] only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." 20 U.S.C. § 1412(a)(5). School districts therefore must "ensure that a continuum of alternative placements is available to meet the needs of children with disabilities for special education and related services," including "provision[s] for supplementary services ... to be provided in conjunction with regular class placement." 34 CFR 300.551(b)(2); Conn. Agencies Regs. § 10–76d–1(b) ("Each board of education shall provide all chil-dren requiring special education and related services with the full range of special education and related services as set forth in these regulations ...."). The IDEA broadly defines "supplementary aids and services," as "aids, services, and other supports that are provided in regular education classes or other education-related settings to enable children with disabilities to be educated with nondisabled children to the maximum extent appropriate in accordance with section 1412(a)(5) of this title." 20 U.S.C. § 1401(29).

In short, the plain language of the IDEA and its related regulations do not limit the scope of supplemental aids and service to be provided to disabled children in a regular education setting. Rather, educators "must consider the whole range of supplemental aids and services ... appropriate to the child's particular disabilities." *Oberti,* 995 F.2d at 1216. The Hearing Officer did not err in concluding that the Board failed to do so.

*2. A. can make progress towards achieving her IEP goals in the regular education environment with appropriate supplemental aids and services. In addition, the Board has failed to demonstrate that she can make equal or more progress in a segregated setting.*

The second prong of the *Oberti* test requires the court to engage in a "comparison between the educational benefits the child will receive in a regular classroom (with supplementary aids and services) and the benefits the child will receive in the segregated, special education classroom." *Oberti,* 995 F.2d at 1216. Importantly, the comparison is not limited to a straightforward determination of the setting in which the student will best be able to glean academic benefit. Rather, "the court must

---

**12.** To a large extent, the "appropriateness" analysis thus collapses into the issues of the comparative benefits of alternative settings, the possible negative effects of a service, and cost. As discussed below, a balancing of these factors weighs in favor of inclusion.

pay special attention to those unique benefits the child may obtain from integration in a regular classroom which cannot be achieved in a segregated environment, i.e., the development of social and communication skills from interaction with nondisabled peers." *Id.; see also Sacramento City Unified Sch. Dist., Bd. of Educ. v. Rachel H.,* 14 F.3d 1398, 1401 (9th Cir. 1994) (upholding trial court that found mentally retarded student would benefit from regular education setting because, *inter alia,* the Board's evidence "focused on [the student's] limitations but did not establish that the educational opportunities available through special education were better or equal to those available in a regular classroom."); *Daniel R.R.,* 874 F.2d at 1046–48 (the opportunity for interaction with nondisabled students may be "sufficient ground for mainstreaming," if, for the individual student, the "benefits of regular education [outweigh] the benefits of special education."); *St. Johnsbury Acad. v. D.H.,* 20 F.Supp.2d 675 (D.Vt. 1998) (finding that "the value of mainstreaming vastly outweigh[ed] the relevance or importance of [the district's] fifth-grade [academic] achievement requirement."), *rev'd on other grounds,* 240 F.3d 163 (2001). Thus, the appropriate yardstick is whether A., with appropriate supplemental aids and services, can make progress towards her IEP goals in the regular education setting. *See Mavis,* 839 F.Supp. at 988 ("Given the fact that the IEP process is designed in part to define satisfactory education for each child on an individual basis and that this process is part of the statutory scheme ... Congress [can not have] intended mainstreaming to be restricted to those who could progress from grade to grade in the normal aca-

demic program. Rather, the ability of the child to be mainstreamed successfully will depend on the goals of the IEP and the child's achievement of those goals.") (quoting *Thornock v. Boise Indep. Sch. Dist. No. 1,* 115 Idaho 466, 767 P.2d 1241, 1250 (1988), *cert. denied,* 490 U.S. 1068, 109 S.Ct. 2069, 104 L.Ed.2d 634 (1989)); *see generally County of San Diego v. California Special Educ. Hearing Office,* 93 F.3d 1458, 1462 (9th Cir.1996) ("To measure whether a child benefits from the current educational services she receives, the IEP team determines whether there is progress toward the central goals and objectives of the IEP.").[13] The court must, of course, "rely heavily ... on the testimony of the [parties'] educational experts," in making this comparison. *Id.*

The issues raised by the second prong of the *Oberti* test lie at the heart of the parties' disagreement over the proper placement for A. The Board, relying on the testimony of its experts, argues that there was "no evidence to suggest that either of these measures [i.e., direct instruction from a special education teacher and/or increased consultant involvement] would have enabled A. to succeed in her then-current educational placement." (Def's Opp. Memo. at 7.) In turn, A.'s parents, relying on the testimony of their experts, argue that the Hearing Officer correctly concluded that A. could benefit in the regular education environment, with appropriate supplemental services.

In large part, the Board's arguments are premised on A.'s lack of success in obtaining academic skills and the growing gap between what she and her peers in the regular education classroom were substantively learning. (*See, e.g.,* Def's Memo. at

---

**13.** The Board implicitly acknowledges that the correct measure of progress is whether A. is progressing towards meeting her IEP goals. (*See* Def's Opp. Memo. at 7) (arguing that the Board was permitted to recommend a more restrictive placement because "A. failed to make reasonable progress on her IEP goals and objectives.")

19–21; Def's Opp. Memo. at 9.) That focus is, however, squarely at odds with the core principles of the IDEA. The IDEA does not require that disabled and nondisabled students receive the same academic experience. *Rowley*, 458 U.S. at 189, 102 S.Ct. 3034. Rather, as the *Oberti* court explained:

> In passing the [IDEA], Congress recognized the importance of teaching skills that would foster personal independence and dignity for handicapped children. Learning to associate, communicate and cooperate with nondisabled persons is essential to the personal independence of children with disabilities. The Act's mainstreaming directive stems from Congress's concern that the states, through public education, work to develop such independence for disabled children.

*Oberti*, 995 F.2d at 1217 n. 23. Mainstreaming also serves the important goal of "[t]eaching nondisabled children to work and communicate with children with disabilities," so as to "eliminate the stigma, mistrust and hostility that have traditionally been harbored against persons with disabilities." *Id.* at 1217 n. 24.

The record amply supports the Hearing Officer's conclusion that A. "can still benefit from the her [sic] placement in a regular class." (AR–42 at 11.) For example, the independent educational consultant hired by the Board to supervise A.'s program testified that A. was in fact making progress towards her IEP goals, even without the supplemental services the Hearing Officer ordered the Board to provide. (Tr. Beninghof 9/15/97 at 52.) She also recommended, however, that changes should be made to "address the lack of interaction with [A.'s] non-disabled peers." (*Id.* at 60.) The independent consultant's view, which is consistent with the Hearing Officer's findings, is best summarized by the following testimony:

> I would like to see [A.] make more progress than she made last year [her freshman year], so I'm not satisfied— totally satisfied with the level of progress that she made, but I do see that she made progress in a new school setting with new staff, so that I am satisfied enough with the progress to think that it does not warrant a dramatic change in her program to a more self-contained setting.

(*Id.* at 79–80; *see also* Tr. Hamilton 9/4/97 at 130, 169, 186–92; 11/24/97 at 217, 218; Tr. Librandi 1/14/98 at 77, 78.)[14]

The Board also, however, makes a more subtle argument. It asserts that, because A. was not engaged in the same academic instruction as her classmates, she was necessarily isolated from them and therefore did not have an effective peer group upon whom to model her behavior, and therefore make progress towards her IEP goals. In contrast, "[u]nder the Board's proposed program, A. would have received direct instruction in functional academic skills in a classroom with other students who would also be working on the same skills, enabling her to model skills to receive the intensive and repetitive instruc-

---

**14.** The Board emphasizes that, under its proposed plan, A. would continue to be mainstreamed in non-academic classes such as art, gym, and lunch. It asserts that A. would, in those classes, be working on the same skills as her peers and therefore would better be able to achieve her non-academic goals that are dependent on meaningful interactions with peers. As a preliminary matter, the Board has failed to present evidence that A. could achieve her goals satisfactorily in its suggested plan. Rather, there was undisputed evidence that no facilitation of interactions between students occurred during lunch and art class. Thus, the Board has failed to demonstrate why, without additional supportive services, A.'s situation would be expected to improve.

tion she requires in order to retain information." (Def's Opp. Memo. at 11.) In other words, "instead of performing vocational tasks alone with her paraprofessional [in the regular education classroom] in the DH program, A. [would] have an opportunity to work alongside peers and to learn vocational skills in a social environment in the community." (*Id.*) Expert testimony offered by the Board supports its view that, in the DH Program, A. would, after having mastered communication skills with disabled peers, transfer the use of those skills to settings with nondisabled peers and, eventually, in the community at large. (*See, e.g.,* Tr. Tezerakis 9/3/97 at 168–74.)

Even were the court to assume that the Board's proposed plan would be a viable and effective placement for A., in that she could make progress towards her appropriately stated IEP goals rather than progress towards purely academic goals,[15] what would still be missing from the Board's argument is evidence that A. could not, with appropriate supplemental aids and services, make the same or even more progress in the regular education setting. Perhaps most telling on this point is the testimony of the Board's expert. First

and foremost, the Board's expert candidly admitted that she made *no* assessment of what possible modifications or support services could be provided within the regular education curriculum to assist A. in meeting her IEP goals. (*Id.* at 223.) Furthermore, she testified that "in order to make [meaningful interactions with nondisabled peers] possible, special plans would have to be made and implemented and reinforced." (Tr. Tezerakis 9/3/97 at 132; *see also id.* at 70 ("[W]hile it could have been the case that someone would be directed to do something that would specifically engage [A.], that had not occurred ....").)[16] Thus, the Board's expert, far from testifying that A. could not receive an appropriate education in the regular classroom environment with appropriate supplemental services, testified that A. could receive meaningful benefits if appropriate action was taken.

In short, the Board has not demonstrated that it made any meaningful examination of the possible supplemental aids and services that could be provided to A. in the regular education setting. Nor has it presented evidence that the program it proposed would provide A. with an equal, let

**15.** A.'s parents vociferously disagree and argue that the DH Program provided poor instruction and few opportunities for disabled students to interact with their nondisabled peers. As discussed *infra*, the Board has failed to present evidence concerning the appropriateness of the DH Program.

**16.** Obviously, to the extent the Board's view reflects a pedagogical preference for a non-mainstream curriculum, it is squarely at odds with the IDEA. *See Roncker,* 700 F.2d at 1063 (6th Cir.1983) ("The perception that a segregated institution is academically superior for a handicapped child may reflect no more than a basic disagreement with the mainstreaming concept. Such a disagreement is not, of course, any basis for not following the Act's mandate."). Moreover, to the extent the parties' disagreement is, in essence, a dispute

between differing educational philosophies both supported by expert testimony, the court is particularly mindful of its duty to accord due deference to the Hearing Officer's decision and his educational expertise. *See Briggs v. Bd. of Educ. of the State of Conn.,* 882 F.2d 688, 693 (2d Cir.1989) (deferring to educational expertise of state and local agencies); *D.F. v. Western Sch. Corp.,* 23 IDELR 1121, 11 (S.D.In.1996) (Where "[t]he real dispute ... does not concern historical facts or judgments of credibility ... [but rather] a dispute between experts in special education over the extent to which mainstreaming is appropriate ... [t]he case ... presents a dispute over educational theory, practice, and policy—the type of dispute where deference to the educational expertise of a hearing officer is especially appropriate under Rowley ....").

alone better, educational experience. Absent such evidence, the Board can not, in any meaningful way, argue that a more segregated placement would, in comparison, be more appropriate for A.

### 3. The Board has not presented sufficient evidence of any negative effects of including A. in the regular education environment.

The Board relies heavily on the purported evidence that A. "has a history of disrupting the class," to argue that retaining A. in the regular education setting would have a negative impact on the nondisabled students. (Def's Opp. Memo. at 15.) As a preliminary matter, while the record certainly reflects that, at various times, A. experienced behavioral difficulties in the regular education setting, the record is considerably less clear concerning whether such behavioral problems resulted in disruption or negative effects to the regular education environment.[17]

Furthermore, the record reflects that the behavioral problems A. experienced were manageable. For example, the Board candidly admits that "A.'s maladaptive behaviors are largely under control for the 15–20 minutes that A. actually spends in the regular classroom before having to 'take a break.' " (Def's Memo. at 21.) The Board also, in arguing under the first prong of the *Oberti* test that it took suffi-

cient steps to try to include A. in the regular education classroom, asserts that "[w]hen [A.'s] behavior was interfering with her ability to make progress in regular education, the Board developed a behavior intervention plan, analyzed A.'s success under the plan, collected data, reanalyzed and readjusted the plan until her behavior was under control." (Def's Memo. at 19; *see also* Def's Opp. Memo. at 6.)

Finally, and perhaps most significantly, it is clear that the Board did not base its decision to move A. to a more restrictive setting on A.'s behavioral problems or an alleged disruption to the regular education setting. Rather, the minutes from the January 1997 PPT meeting explicitly reflect that A.'s behavior was *not* a consideration. (B97–18 at 8.) ("Ms. Shippee asked the team if they were having any behavioral difficulties. The team stated they were *not.*") (emphasis in original). Thus, on the basis of the evidence presented to the Hearing Officer, A.'s behavior can hardly be said to have been "so disruptive . . . that the education of other students is significantly impaired," *Oberti,* 995 F.2d at 1217 (quoting 34 CFR § 104, Appendix, ¶ 24.), let alone that her behavior could not be brought under control with the provision of appropriate supplemental aides and services.[18]

---

**17.** This is not a distinction without difference. The goals advanced by the IDEA's mainstreaming mandate, both for special and regular education students, should not be allowed to be sidetracked by the mere showing that a special education student has exhibited behavioral problems. Presumably many regular education students will also, at times, exhibit behavioral problems that are either manageable or non-disruptive.

**18.** The court need not decide whether cost is an appropriate factor to be considered in the mainstreaming equation because the Board failed to raise that issue before the Hearing Officer. *See Garro v. State of Connecticut,* 23

F.3d 734, 737 (2d Cir.1994) (plaintiff failed to exhaust when did not raise, and hearing officer did not consider, any alleged procedural violations by local defendants); *Bruschini v. Bd. of Educ. Arlington Cent. Sch. Dist.,* 911 F.Supp. 104, 107 (S.D.N.Y.1995) (opportunity to present additional evidence to the federal court does not extend jurisdiction to matters not raised at the administrative level). Furthermore, although the Board argues that the cost of hiring a full time special education teacher would be prohibitive, it has not raised any argument about the costs it would incur in providing additional consultant time or any of the other appropriate supplemental ser-

## D. THE HEARING OFFICER DID NOT ERR IN REQUIRING THE BOARD TO REIMBURSE THE COST OF THE HAMILTON EVALUATION

■ Parents of disabled children have a "right to evaluation at public expense" under certain circumstances. 34 CFR § 300.502(b). Specifically, if a parent "disagrees with an evaluation obtained by the public agency," it can "request[ ] an independent educational evaluation at public expense." *Id.* "[T]he public agency must, without unnecessary delay, either—[i]nitiate a hearing under § 300.507 to show that its evaluation is appropriate," or "[e]nsure that an independent educational evaluation is provided at public expense, unless the agency demonstrates in a hearing under § 300.507 that the evaluation obtained by the parent did not meet agency criteria." *Id.; see also* Conn. Agencies Regs. § 10–76d–9(c).

There is no dispute that A.'s mother promptly expressed dissatisfaction with the Board's evaluations and requested an independent evaluation. The Board argues, however, that the Hearing Officer erred because he did not find that the Board's evaluations were "inappropriate" prior to ordering reimbursement.[19] The Board also argues that Hamilton's evaluation was insufficient because she did not do an independent evaluation, but merely confirmed information already in the possession of the Board and because the evaluation was completed in preparation for the due process hearing, not as an independent evaluation.

The record amply supports the Hearing Officer's conclusion that the Board's evaluations were not appropriate. When performing independent evaluations, educators must, *inter alia*, utilize "[a] variety of assessment tools and strategies ... to gather relevant functional and developmental information about the child, including information provided by the parent, and information related to enabling the child to be involved in and progress in the general curriculum ... that may assist in determining—[t]he content of the child's IEP." 34 CFR § 300.532(b); *see also* Conn. Agencies Regs. § 10–76d–9(b). At the January 21, 1997 IEP, the Board relied on written assessments of A.'s educational progress prepared by A.'s regular education teachers and a report by her special education teacher. Importantly, those reports did not evaluate A.'s progress toward the goals and objectives in her IEP. In fact, the Board expressly refused to conduct such an assessment, even though its own consultant suggested that such an educational assessment should precede any change in placement. (Tr. Garrison 9/15/97 at 138–39; Tr. Mrs. S. 11/10/97 at 121.) Rather, it waited until one month after it initiated due process on its decision to remove A. from a mainstream setting to hire an expert to perform an educational assessment. (B97–18 at 8.) Under these circumstances, the Hearing Officer did not err in concluding that the Board failed to prove its evaluations were appropriate.

vices advocated by A.'s experts. In any event, the Board has failed to demonstrate how the recommended expenditures would "significantly impact upon the education of other children in the district." *Greer*, 950 F.2d at 697.

19. The Board also takes issue with the Hearing Officer's failure to make specific findings about the reasons why the Board's evaluations were inappropriate. Although such findings would, of course, have been helpful, the Board has failed to point to any authority requiring the Hearing Officer to make specific findings on that issue, let alone holding that the failure to make specific findings necessitates reversal.

Moreover, the fact that A.'s parents requested the evaluation, and it was performed after the Board made its placement decision and the parties requested a due process hearing, does not, under the circumstances of this case, alleviate the Board's duty. It would violate the spirit of the regulations for the Board to base its placement decision on reports, without affording the parents a meaningful opportunity to object and hire an independent evaluator prior to the Board filing for due process, but then to refuse to reimburse the parents for the independent evaluation because it was filed in anticipation of the due process hearing rather than the IEP. That is, however, the undisputed time line of events in this case.

Finally, the Board's challenge to the methodology used by Hamilton is unavailing.[20] The plain language of the applicable regulations requires only that a parent's expert meet the same criteria that the Board used when initiating its evaluation, not that the expert employ a methodology approved by the Board. Specifically, the regulations enumerate, by way of example, "the location of the evaluation and the qualifications of the examiner" as applicable criteria that "must be the same as the criteria that the public agency uses when it initiates an evaluation." 34 C.F.R. § 300.502(e)(1). Moreover, these criteria must be met only "to the extent [they] are consistent with the parent's right to an independent educational evaluation." *Id.* Finally, the regulations specifically prohibit the "public agency [from] impos[ing] conditions or timelines related to obtaining an independent educational evaluation at public expense," other than the criteria described in the regulation, on a parent's independent evaluation. *Id.* at (e)(2). Thus, the Board's disagreement with Ham-

ilton's methodology is meritless. The Hearing Officer did not err in ordering the Board to reimburse A.'s parents the cost of Hamilton's report.

## *CONCLUSION*

The Hearing Officer did not err in applying the *Oberti* test. Rather, the record demonstrates that the Hearing Officer properly concluded that the Board did not comply with the IDEA's mainstreaming requirement. The Hearing Officer also properly required the Board to reimburse the costs of Hamilton's evaluation. Accordingly, for the reasons discussed above, the Board's motion for summary judgment **[doc # 23 ]** is denied and A.'s motion for summary judgment **[doc # 21]** is granted.

It is so ordered.

---

**20.** The Board's argument is rendered further suspect by the fact that the Board's expert at the hearing, Ann Tzerakis, used the same methodology as Hamilton.