**R.M. on her own behalf and on behalf of her son, J.M. Plaintiffs,**

**v.**

**VERNON BOARD OF EDUCATION, et al., Defendants.**

No. CIV.A.3:01–CV–392(CF).

United States District Court,
D. Connecticut.

May 22, 2002.

Mary Jean Schierberl, Connecticut Legal Services, New Britain, CT, for Plaintiff.

Thomas R. Gerarde, Bruce J. Gelston, Melinda A. Powell, Howd & Ludorf, Hartford, CT, Michael Peter McKeon, Lawrence J. Campane, Sullivan, Schoen, Campane & Connon, Hartford, CT, for Defendants.

Ralph E. Urban, Attorney General's Office, Hartford, CT, for Dept. of Mental Retardation, Peter O'Meara.

*RULING ON DEFENDANTS' MOTION TO DISMISS AND PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION*

DRONEY, District Judge.

The plaintiffs bring this action under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400–1487; Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794; the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12132, *et seq.;* and the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution, actionable under 42 U.S.C. § 1983, claiming that the defendants failed to provide plaintiff J.M. with an appropriate public education, discriminated against him because of his disability, and deprived him of his right to procedural due process. The plaintiffs seek declaratory and injunctive relief, as well as attorney's fees and costs. The defendants are the Vernon Board of Education; Andrew Maneggia, the Superintendent of the Vernon Public Schools; the Connecticut Department of Mental Retardation; and the Connecticut Commissioner of the Department of Mental Retardation.

Currently pending are the Vernon Board of Education and Andrew Maneggia's Motion to Dismiss [Document # 8], and the plaintiffs' motion for a preliminary injunction [Document # 5].

**I. Motion to Dismiss**

**A. Facts** [1]

J.M. is a "multiply disabled" twenty-two year old [2] male who has been receiving

---

1. The facts outlined in this section of this opinion are taken from the allegations contained in the plaintiffs' complaint and the January 12, 2001 decision of Hearing Officer Stacy M. Owens ("Hearing Officer Owens"). *See Cortec Industries, Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir.1991) (stating that the court can consider administrative materials if those materials serve as the basis for the plaintiffs' claim).

2. J.M. turned twenty-one on September 13, 2000. Generally, under the IDEA, "a [dis-

abled] child does not have a right to demand a public education beyond the age of twenty-one." *Mrs. C. v. Wheaton,* 916 F.2d 69, 75 (2d Cir.1990) (citation omitted). The Second Circuit, however, has held that compensatory education for a child over twenty-one years old may be appropriate where there has been a gross violation of the IDEA. *Id.* at 75; *see also Garro v. Connecticut,* 23 F.3d 734, 737 (2d Cir.1994). Such an award requires a school district to provide compensatory education in order to make up for deprivations

special education and related services since he was fourteen. J.M. has been diagnosed with "mild to moderate mental retardation, hyperactivity, distractability, impulsivity, paraphilia, pervasive developmental disorder, social and emotional disturbance and depression" and has a history of inpatient hospitalizations due to psychiatric and behavioral issues. Both the Vernon Board of Education ("the Board") and the Connecticut Department of Mental Retardation ("DMR") have provided J.M. with services related to his disabilities.

Between 1998 and March 2000, J.M. lived at a group home operated by the Central Connecticut Association for Retarded Citizens, Inc. ("CCARC") in New Britain, Connecticut, and received educational services funded by the Board.[3] In March 2000, he exhibited dangerous behavior at the home and was hospitalized at the University of Connecticut Medical Center ("UCONN"). Upon his release from UCONN in June 2000, DMR placed J.M. in a converted lounge in an administrative building on the campus of DMR's Greater Hartford Regional Center ("Hartford Regional Center") in Newington, Connecticut, as a temporary "respite" home. Also at this time, J.M.'s education was in a "transitional phase" while the Board was pursuing appropriate educational options for him.[4]

On July 19, 2000, a meeting of J.M.'s planning and placement team ("PPT")[5] was held, including staff from the Board and DMR, and J.M.'s mother, R.M., and it was determined that J.M. remained eligible for special education services, that a June 15, 1999 individualized education plan ("IEP") would remain effective through a continued "transitional phase" in which the Board was pursuing educational programming options for J.M., and that the next PPT meeting would convene at the start of a new educational program. At this same meeting, R.M. requested that J.M. be moved from the lounge at Hartford Regional Center to a school where he would receive a twenty-four hour, integrated program of treatment and instruction, also known as a "residential educational placement." A dispute then ensued between the Board and DMR as to the responsibility for paying for such a placement, and whether it was necessary. As a result, J.M. was not offered such a placement. On August 29, 2000, R.M. requested a due process hearing under the IDEA. In October 2000, the Board enrolled J.M. in an educational/vocational program run by Options Unlimited, Inc. ("Options"). The due process hearing was convened on October 31, 2000, November 6, 2000, and November 30, 2000. On January 12, 2001, Hearing Officer Owens dismissed the plaintiffs' claims with prejudice. On March 14, 2001, the plaintiffs filed the instant complaint.

The defendants Vernon Board of Education and Andrew Maneggia have filed a motion to dismiss under Fed.R.Civ.P. 12(b)(1) for lack of subject matter jurisdiction on the grounds that (1) the plaintiffs failed to file the complaint within forty-five

---

that occurred before the child reached the age of twenty-one. *See id.*

**3.** The plaintiffs' complaint alleges that, at several points between 1998 and 2000, the Board failed to provide J.M. with educational services.

**4.** The nature of the transitional educational program is not clear from the complaint or Hearing Officer Owens' decision.

**5.** A disabled child's planning and placement team determines the particular educational needs of the child and the services required to meet those needs and is comprised of several individuals, including the child's special education teacher, a regular education teacher, parents, and when appropriate, the child. 20 U.S.C. § 1414(d)(1)(B); Conn. Agencies Regs. § 10–76a–1(p).

days of the hearing officer's decision as required by Connecticut General Statute § 4–183, and (2) the plaintiffs have failed to exhaust the administrative remedies available to them under 20 U.S.C. § 1415, because they failed to raise their claims at the July 2000 PPT meeting.

## B. Standard

When considering a motion to dismiss for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1), "a district court must look to the way the complaint is drawn to see if it claims a right to recover under the laws of the United States." *IUE AFL–CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1055 (2d Cir.1993) (quoting *Goldman v. Gallant Secs. Inc.,* 878 F.2d 71, 73 (2d Cir.1989)), *cert. denied,* 513 U.S. 822, 115 S.Ct. 86 (1994). In doing so, the allegations of the complaint are construed in the plaintiff's favor. *See Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), *overruled on other grounds, Davis v. Scherer,* 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984); *Connell v. Signoracci,* 153 F.3d 74 (2d Cir.1998); *Atlantic Mut. Ins. Co. v. Balfour Maclaine Intern. Ltd.,* 968 F.2d 196, 198 (2d Cir.1992). A district court, however, need not confine its evaluation of subject matter jurisdiction to the face of the pleadings and may consider affidavits and other evidence submitted by the parties. *See Land v. Dollar,* 330 U.S. 731, 735 & n. 4, 67 S.Ct. 1009, 91 L.Ed. 1209 (1947); *Exchange Nat'l Bank v. Touche Ross & Co.,* 544 F.2d 1126, 1130–31 (2d Cir.1976); *Matos v. United States Dep't of Hous. & Urban Dev.,* 995 F.Supp. 48, 49 (D.Conn.1997). Once the question of subject matter jurisdiction has been raised, the burden of establishing subject matter jurisdiction rests on the party asserting jurisdiction. *See Thomson v. Gas-*

*kill,* 315 U.S. 442, 446, 62 S.Ct. 673, 86 L.Ed. 951 (1942).

## A. Discussion

### 1. Timeliness of Appeal

First, as to the timeliness of the plaintiffs' complaint, Connecticut law provides that a motion to clarify a hearing officer's decision serves to "toll the time for appeal of the hearing officer's decision. The time to appeal shall run from the date of the mailing of the decision of the hearing officer on the motion to clarify." Conn. Agencies Regs. § 10–76h–8(f)(4).[6] On January 26, 2001, the plaintiffs filed with Hearing Officer Owens a motion for clarification of her January 12, 2001 decision. On February 6, 2001, Hearing Officer Owens considered and denied the plaintiffs' request. Thus, the plaintiffs had forty-five days from the date Hearing Officer Owens mailed her decision on clarification to file their appeal. Assuming Hearing Officer Owens's decision was mailed on the date it is dated, the plaintiffs had until March 23, 2001 to file the instant case. As it was filed on March 14, 2001, the Court finds the appeal to be timely. Accordingly, the Court declines to dismiss the plaintiffs' complaint on this basis.

### 2. Failure to Exhaust Administrative Remedies

The Board also argues that the plaintiffs' failure to exhaust the administrative remedies available under 20 U.S.C. § 1415 and Conn. Gen.Stat. §§ 10–76a *et seq.* deprives this Court of its subject matter jurisdiction. Specifically, the Board contends that Hearing Officer Owens' decision that the plaintiffs failed to raise the due process hearing issues at a prior PPT meeting forecloses the instant appeal.

---

**6.** The procedures governing due process hearings under the IDEA are supplied by State

law. *See* 20 U.S.C. § 1415; Conn. Gen.Stat. § 10–76h.

■ Although the IDEA provides for a federal cause of action to enforce rights under the IDEA, "it imposes a broadly applicable requirement that plaintiffs first exhaust administrative remedies ...." *Polera v. Bd. of Educ. Newburgh Enlarged Sch. Dist.*, 288 F.3d 478, 483 (2d Cir.2002) (citing 20 U.S.C. § 1415(*l*)). "[P]laintiffs with grievances related to the education of disabled children generally must [also] exhaust their administrative remedies before filing suit in federal court, even if their claims are formulated under a statute other than the IDEA (such as the ADA or the Rehabilitation Act)." *Id.* at 481 (citing 20 U.S.C. §§ 1400–1490). A plaintiff's failure to exhaust administrative remedies under the IDEA deprives a court of subject matter jurisdiction. *See id.* at 483; *Hope v. Cortines*, 69 F.3d 687, 688 (2d Cir.1995).

Here, Hearing Officer Owens dismissed the plaintiffs' claims on two grounds: (1) she lacked "jurisdiction" to grant the plaintiffs' request for a residential educational placement, because the necessary residential placement was not related to J.M.'s educational needs, and (2) the plaintiffs' request for a due process hearing under the IDEA was premature in light of R.M.'s failure to raise at the July 2000 PPT meeting any hearing issue other than the requested residential educational placement.[7] *See* Decision of January 12, 2001 at 5 (dismissing the case with prejudice citing (1) "failure to first bring forth the issues at a Planning and Placement Team meeting in accordance with Section 10–76H(a)(1)"[8]

and (2) "lack of jurisdiction over the issues relating to residential placement").

It is apparent that the hearing officer concluded that R.M. raised the issue of whether an *educational* residential placement was appropriate at the prior PPT hearing. Indeed, she specifically found that R.M. raised the issue of J.M.'s residential placement at a the July 2000 PPT meeting. *See* Decision of January 12, 2001, Conclusions of Law, ¶ 5 ("With the exception of [J.M.]'s residential placement, the record shows that the parent failed to bring forth her concerns at the July 19, 2000 PPT meeting."). Hearing Officer Owens' conclusion that she lacked "jurisdiction" to grant a residential placement for J.M. did not rest on a finding that this issue was not raised at a prior PPT meeting. Rather, this conclusion rested on Hearing Officer Owens' finding that J.M.'s emotional and educational problems were not intertwined such that "the scope of his special education and related services must include the acquisition of socialization or community living skills in a residential treatment program." Decision of January 12, 2001, Conclusions of Law, ¶ 3 (citing *J.B. v. Killingly Board of Education*, 990 F.Supp. 57, 64 (D.Conn.1997)). Therefore, this issue was exhausted, i.e., raised at a PPT meeting, raised at a due process hearing, and adjudged in a final decision of a hearing officer. *See* 20 U.S.C. § 1415 and Conn. Gen.Stat. § 10–76h(a)(1). That Hearing Officer Owens found she lacked "jurisdiction" to grant the plaintiffs' re-

---

7. As to this second ground, Hearing Officer Owens concluded:

 [O]n August 29, 2000, the date on which the parent filed her request for a hearing, that she was unaware of [J.M.]'s educational placement except that which she agreed upon, which was a transitional placement in accordance with the June 15, 1999 IEP while the Board pursued an appropriate educational program to meet [J.M.]'s spe-

cial education needs. The only placement the parent was aware of was [J.M.]'s residential placement ....

Decision of January 12, 2001, Conclusions of Law, ¶ 2.

8. Conn. Gen.Stat. § 10–76h(a)(1) provides that "no issue may be raised at [a due process] hearing unless it was raised at a[PPT] meeting for such child or pupil."

quested relief does not divest this court of subject matter jurisdiction over the plaintiffs' complaint. Accordingly, the Court declines to dismiss the plaintiffs' complaint on this basis,[9] and the Board's motion to dismiss [Doc. # 8] is DENIED.

## II. Motion for Preliminary Injunction

The Court next turns to the plaintiffs' request for an injunction requiring the defendants to provide J.M. with two years of compensatory education in the form of placement at a school where he would receive a twenty-four hour, integrated program of treatment and instruction, or, a "residential education placement in a community setting."

### A. Findings of Fact

The Court makes the following findings of fact in connection with the plaintiffs' motion for preliminary injunction:

1. Plaintiff J.M. was born on September 13, 1979.

2. Plaintiff R.M. is the mother of J.M. and resides in Vernon, Connecticut.

3. J.M. has been diagnosed with attention deficit hyperactivity disorder, depressive disorder, post traumatic stress disorder, and paraphilia.[10] He has been deemed at high risk for engaging in inappropriate sexual and non-sexual behaviors and has been classified as mildly mentally retarded.

4. In 1989, J.M. was voluntarily placed in foster care by his family.

5. In 1989, J.M. was determined to be eligible for services from the Department of Mental Retardation ("DMR").

6. DMR has provided J.M. with residential care and services from November 1994 until the present date.

7. In December 1998, DMR placed J.M. at the Central Connecticut Association for Retarded Citizens, Inc., ("CCARC"), where he received both residential and educational services. At CCARC, J.M.'s residential placement was funded by DMR and his educational services were funded by the Vernon Board of Education ("the Board").

8. In March 2000, after J.M. had exhibited dangerous behavior at CCARC, DMR hospitalized him at the University of Connecticut Medical Center ("UCONN") for observation and evaluation.

9. Upon J.M.'s discharge from UCONN, CCARC determined that it could no longer provide adequate services to maintain the safety of J.M., his peers, or staff, because of his behavior.

10. On June 1, 2000, as a temporary "respite" placement, DMR placed J.M. in an administrative building on the campus of the DMR's Greater Hartford Regional Center in Newington, Connecticut ("Hartford Regional Center") in a room that had previously been used as a family visiting lounge.

---

9. To the extent that the plaintiffs' complaint does raise issues the hearing officer found were not raised at a prior PPT (i.e. issues with J.M.'s "transitional" educational phase), which is not entirely clear from the pleadings and administrative record, the Court expresses no opinion on the exhaustion of such claims at this time.

10. "Paraphilia" is defined as "sexual behavior that is considered deviant or abnormal." Webster's New World College Dictionary 1045, def. 1 (2001). At the hearing on the motion for preliminary injunction, James Black, M.D., a witness for the Board, testified that paraphilia is characterized by sexual impulses toward adults of both genders, children, and animals.

11. On July 19, 2000, a meeting of J.M.'s PPT was held at which it was determined that J.M. remained eligible for special education services, that a June 15, 1999 IEP would remain effective through a "transitional period" in which the Board would pursue educational programming options, and that the next PPT meeting would convene at the start of a new educational program.

12. At the July 19, 2000 PPT meeting, R.M. expressed her dissatisfaction with J.M.'s living situation and requested that J.M. be moved from his residential placement at the Hartford Regional Center to a school where he would receive a twenty-four hour, integrated program of treatment and instruction, also known as a "residential educational placement."

13. Also at the July 19, 2000 PPT meeting, the Board and DMR denied the necessity of and the responsibility for paying for "residential educational placement" requested by R.M.

14. On August 29, 2000, R.M. requested a due process hearing to review J.M.'s placement.

15. In October 2000, the Board enrolled J.M. in an educational/vocational program run by Options Unlimited, Inc. ("Options"). J.M. currently receives thirty hours of services from Options per week.

16. Options provides J.M. with the opportunity to engage in various work and community activities including landscaping, house maintenance, courier and delivery work, cooking, riding, hiking, bowling, and money management instruction. J.M. also receives behavior and school-based counseling from a counselor employed by Options.

17. The educational services J.M. receives from Options are appropriate for his needs.

18. The due process hearing requested by R.M. was convened on October 31, 2000, November 6, 2000, and November 30, 2000.

19. R.M. raised the following issues at the due process hearing:

a. Whether the Board is providing J.M. with a free and appropriate public education;

b. Whether the Board has complied with the procedural requirements of federal and state law including the Individuals with Disabilities in Education Act (IDEA) and § 504 of the Rehabilitation Act of 1973 in the provision of services to J.M.;

c. Whether J.M. is entitled to compensatory education;

d. Whether the Board is discriminating against J.M. in violation of Section 504 and IDEA on the basis of the severity of his disability.

20. On January 12, 2001, Hearing Officer Owens dismissed the plaintiffs' claims with prejudice, on the basis that she lacked jurisdiction to order a residential placement for J.M. because such placement is not a service related to J.M.'s educational program, and because R.M. failed to raise issue with the "transitional phase" of J.M.'s education at the July 2000 PPT meeting.

21. Since the filing of this complaint, J.M. was moved to, and currently resides in, a room in a large colonial house on the campus of the Hartford Regional Center. J.M. is housed with eight other persons and has his own bedroom and ac-

cess to a kitchen and communal living area.

22. J.M.'s living situation provides him with opportunities for various social and leisure activities. Although J.M. is supervised around the clock, he is free to take his meals with other residents of the group home or at one of the other homes or facilities on the campus of the regional center.

23. J.M.'s current living situation is well-suited to his needs.

## B. Conclusions of Law

### 1. Standard for Preliminary Injunction

 The Second Circuit has cautioned that preliminary injunctive relief "is an extraordinary and drastic remedy which should not be routinely granted." *Buffalo Forge Co. v. Ampco–Pittsburgh Corp.*, 638 F.2d 568, 569 (2d Cir.1981) (internal quotation marks omitted). Entry of a preliminary injunction is appropriate where the party seeking the injunction establishes: (a) the injunction is necessary to prevent irreparable harm, and (b) either (i) likelihood of success on the merits, or (ii) sufficiently serious questions going to the merits of the claim as to make it fair ground for litigation, and a balance of the hardships tips decidedly in favor of the movant. *See, e.g., Able v. United States,* 44 F.3d 128, 130 (2d Cir.1995).

 Where a party is moving to "alter[ ] the status quo by commanding some positive act," the movant "must meet a higher standard." *Malkentzos v. DeBuono,* 102 F.3d 50, 54 (2d Cir.1996). Such a "mandatory injunction" shall issue "only upon clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of preliminary relief." *Id.* (quoting *Abdul Wali v. Coughlin,* 754 F.2d 1015, 1025 (2d Cir.1985), *abrogated on oth-*

*er grounds, Fromer v. Scully,* 874 F.2d 69, 74 (2nd Cir.1989)); *see also Tom Doherty Assocs. v. Saban Entm't, Inc.,* 60 F.3d 27, 33 (2d Cir.1995); *J.B.,* 990 F.Supp. at 70. As the plaintiffs are seeking to alter the "status quo" by requiring the defendants to change J.M.'s educational and residential placements and offer him a "residential education placement in a community setting," the Court's inquiry must proceed under this more stringent standard.

### 2. Application of Preliminary Injunction Standard

 A host of issues are raised by the plaintiffs' complaint. Those issues include: whether the plaintiffs have exhausted their administrative remedies; whether J.M.'s requested residential placement would be a service related to his educational needs; whether J.M.'s temporary "respite" placement at the Hartford Regional Center, residential placement in the colonial house at the Hartford Regional center, and/or educational placement at Options violated his right to a free and appropriate public education under the IDEA; whether the Board has complied with federal and state law with regard to its provision of education to J.M.; whether DMR has complied with federal and state law with regard to its provision of residential services to J.M; and whether J.M. is entitled to compensatory education, and in what form.

However, the Court declines to reach whether the plaintiffs have established a likelihood of success on such issues, as the Court finds that the plaintiffs have not established that the requested injunctive relief is necessary to prevent irreparable harm, or under the higher standard, extreme or very serious damage. In order to prevail on this prong of the inquiry, the plaintiffs must establish that the harm is "not remote and speculative" but rather "actual and imminent." *State of New York*

*v. Nuclear Regulatory Comm'n*, 550 F.2d 745, 755 (2d Cir.1977). In the context of the IDEA, the denial of a free appropriate public education over an extended period of time clearly constitutes harm, "and the longer that denial continues, the more irreparable it becomes." *Sabatini v. Corning–Painted Post Area School District*, 78 F.Supp.2d 138, 143 (W.D.N.Y.1999); see *J.B.*, 990 F.Supp. at 72 ("J.B. continues to be denied his right to a free appropriate public education and until he receives that to which he is entitled under the IDEA, he is suffering irreparable harm.").

The plaintiffs claim that the Board's refusal to place J.M. in a school where he is offered a twenty-four hour, integrated program of treatment and instruction is causing J.M. irreparable harm. The plaintiffs claim that J.M.'s inadequate educational and residential placement is preventing him from "learning appropriate skills and by default, [is causing him to] learn[ ] inappropriate skills and maladaptive behaviors." In support of their argument, the plaintiffs presented testimony from Eileen Luddy, an "independent education consultant" who conducted an educational evaluation of J.M. Luddy testified that J.M. needs a twenty-four hour, "community-based" residential placement with a high level of supervision and support in order to achieve educational success. Luddy indicated that such a placement is necessary in order for J.M. to benefit from academic instruction, as well as instruction on impulse control, attention, independent living skills, social skills, and vocational skills. Luddy testified further that J.M.'s current treatment has resulted in his dependence on staff and has deprived him of an opportunity to develop self-management skills and that the lack of appropriate learning activities, therapeutic support, role models, and instruction on social skills has given rise to J.M.'s challenge-seeking behaviors and failure to progress academically.

The defendants, however, claim that J.M. is not suffering harm in his current residential placement at the Hartford Regional Center and educational placement with Options, but is actually doing well. James Black, M.D., a witness for the defendants and a board-certified psychiatrist, testified at the preliminary injunction hearing that after a review of various psychiatric evaluations of J.M. and the administrative record, he did not believe J.M. required a residential educational placement, and moreover, that concerns about the safety of J.M., his peers, and the community weigh against such a placement. Dr. Black testified that, while J.M.'s psychiatric and clinical diagnoses must control where J.M. resides, they do not control where J.M. is educated. According to Dr. Black, J.M.'s educational needs can be satisfied outside a residential placement. Additionally, Dr. Black testified that a "community-based" residential placement was not appropriate for J.M. in light of his "paraphilic" urges.

Also at the preliminary injunction hearing, the Board offered testimony from Rosalyn Santacroce, Director of Pupil Personnel Services for the Vernon Board of Education, that J.M. has been receiving thirty hours a week of vocational educational services from Options, including on- and off-site employment and community activities such as cooking, bowling, bike riding, and hiking. Santacroce also testified that J.M. is receiving vocational counseling from a clinician at Options. Additionally, John Gustafson, the DMR behavioral specialist and psychologist who has written and oversees DMR's treatment of J.M., testified that J.M.'s current behavioral guidelines set in place by DMR appear to be successful in encouraging appropriate behavior from J.M. and in assisting him. Gustafason also testified that if J.M.'s current support staff and behav-

ior program were changed, J.M. would likely regress.

Weighing the evidence presented by both parties at the preliminary injunction and in the administrative record, the Court finds that the plaintiffs have not established that J.M. is facing "actual and imminent" harm by his current educational and residential placements. Accordingly, the Court finds the plaintiffs have not established that, absent this Court's grant of a mandatory injunction requiring a "residential education placement in a community setting," J.M. will suffer irreparable harm or extreme or very serious damage.

 The Court notes further that, in cases where an application for a preliminary injunction implicates public interests, "a court should give some consideration to the balance of such interests in deciding whether a plaintiff's threatened irreparable injury and probability of success on the merits warrants injunctive relief." *Time Warner Cable of New York City v. Bloomberg, L.P.*, 118 F.3d 917, 929 (2d Cir.1997). Here, the public interest weighs against granting the plaintiffs' requested relief. Significant evidence was presented at the hearing that J.M. is a danger to himself and others and requires strict supervision at all times. Dr. Black testified that J.M.'s paraphilia prevents him from controlling his sexual impulses toward others. The plaintiffs have failed to show how a community setting would ensure the safety of J.M. and those in the community. Accordingly, the public interest weighs against granting the requested injunctive relief as well.

### 3. Conclusion

As the plaintiffs have failed to show a preliminary injunction is necessary to prevent irreparable harm, the plaintiffs' re-

quest for a preliminary injunction [Doc. # 5] is DENIED.